LANCE A. ETCHEVERRY (SBN 199916)
Lance.Etcheverry@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

JAMES R. CARROLL (*pro hac vice* to be filed)
James.Carroll@skadden.com
MARLEY ANN BRUMME (*pro hac vice* to be filed)
Marley.Brumme@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone:  (617) 573-4800
Facsimile: (617) 573-4822

*Attorneys for Defendant*
*Celonis, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAWN O'CONNELL, an individual, | CASE NO. _____ |
| Plaintiff, | [State Case No. CGC-22-598686 Filed: March 14, 2022] |
| v. | |
| CELONIS, INC., a Delaware corporation; and DOES 1 through 20, inclusive, | **NOTICE OF REMOVAL OF ACTION TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA** |
| Defendants. | [28 U.S.C. § § 1332, 1441 and 1446] |
| | Date: Time: Courtroom: Judge: |

NOTICE OF REMOVAL OF ACTION                                                           CASE NO.:_____

**TO THE CLERK OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SAN FRANCISCO**: Please take notice that pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, defendant CELONIS, INC. hereby gives notice of removal of this action, captioned *O'Connell v. Celonis, Inc. et al.*, bearing case number CGC-22-598686, from the Superior Court of the State of California in and for the County of San Francisco, to the United States District Court for the Northern District of California.

Pursuant to 28 U.S.C. § 1446(a), the Defendants have attached hereto as **Exhibit 1** all of the process, pleadings, and orders in the action that have been served on Defendants in this action to date.

As the requisite "short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), Defendant states as follows:

<u>**BACKGROUND**</u>

1. On March 14, 2022, Plaintiff Shawn O'Connell (an individual who is a citizen of California) ("O'Connell" or "Plaintiff"), filed a Complaint against CELONIS, INC. (a Delaware corporation with its principal place of business in New York) ("Celonis" or "Defendant") and un-named Doe defendants, in the Superior Court of the State of California in and for the County of San Francisco.

2. In his Complaint, Plaintiff O'Connell claims that Celonis purportedly misrepresented the terms of the employment agreement entered into between O'Connell and Celonis on October 26, 2018. O'Connell also claims that he was purportedly terminated in retaliation on July 26, 2021, for his statements concerning an internal investigation.

3. O'Connell asserts that he is entitled to monetary and equitable relief related to the alleged misrepresentation of the terms of his employment agreement and termination. In particular, O'Connell purports to assert claims under California law for intentional and negligent misrepresentation, false promise, breach of contract, promissory estoppel, wrongful termination, retaliation, and unfair competition related to the alleged misrepresentation of the terms of his employment agreement and termination.

4. As set forth more fully below, removal is permissible, pursuant to 28 U.S.C. § 1441, because the court has subject-matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332, and Defendant has satisfied the procedural requirements for removal.

**VENUE AND JURISDICTION**

5.     Removal to this Court of this action is permissible pursuant to 28 U.S.C. §§ 84(a), 1441(a), and 1446(a) because the Superior Court of the State of California in and for the County of San Francisco, where the Complaint was filed, is a state court within the Northern District of California.

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because (1) there is complete diversity of citizenship between Plaintiff and Defendant; (2) the amount in controversy exceeds $75,000, exclusive of interests and costs; and (3) all other requirements for removal have been satisfied.

**I.    THERE IS COMPLETE DIVERSITY OF CITIZENSHIP BETWEEN PLAINTIFF AND DEFENDANTS**

7.     There is complete diversity of citizenship here because (a) Plaintiff is a citizen of California and (b) Defendant is a citizen of New York.

**A.    Plaintiff O'Connell Is Diverse From The Defendants**

**1.    Plaintiff O'Connell Is A Citizen Of California**

8.     Plaintiff O'Connell alleges that he is an individual from the San Francisco Bay Area and has lived in Danville, California for the past 18 years.  (Compl. ¶ 14.)

**2.    Defendant Celonis Is Of Diverse Citizenship To Plaintiff O'Connell**

9.     For purposes of diversity jurisdiction, a corporation is "a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."  28 U.S.C. § 1332(c)(1).

10.     Celonis is a Delaware corporation with its principal place of business in New York.  (Compl. ¶ 16.)

11.     Accordingly, Celonis is of diverse citizenship to Plaintiff O'Connell.

**3.    Defendants Does 1 Through 20 Are Disregarded For Diversity Purposes**

12.     Plaintiff does not allege jurisdiction or mention Does other than in the caption.

13.     In determining whether this action is removable based on diversity of citizenship, the "citizenship of defendants sued under fictitious names shall be disregard."  28 U.S.C. § 1441(b)(1).

14.     Accordingly, the citizenship of Defendants Does 1 through 20 is disregarded.

**II.    THE AMOUNT IN CONTROVERSY EXCEEDS $75,000**

15.     The amount in controversy exceeds $75,000 for removal on the face of the complaint.

2

"[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014). The "notice of removal may assert the amount in controversy if the initial pleading seeks nonmonetary relief." 28 U.S.C. § 1446(c)(2).

16.     The Complaint alleges that (a) O'Connell believed he was granted "3,000 restricted stock units ("RSUs")" which were then "valued at approximately $70" a share, which equates to approximately a $210,000 valuation (Compl. ¶ 1), (b) Celonis's share value has allegedly "increased more than 500%" since O'Connell's onboarding (Compl. ¶ 3), and (c) O'Connell's employment agreement included "$200,000 in annual base salary and $200,000 in annual target commissions" in addition to the "3,000 [RSUs], each corresponding to one share of Celonis stock." (Compl. ¶ 21.)

17.     O'Connell's Complaint seeks monetary damages and nonmonetary relief, including "injunctive and declaratory relief" as well as punitive damages and attorney fees and costs. (Compl. ¶¶ 77, 88, 148 & Prayer for Relief.) As such, the amount in controversy exceeds $75,000. *See Villagomez v. Lincoln Life Assurance Co. of Bos.*, No. 22-CV-00292-LB, 2022 WL 883080, at *3 (N.D. Cal. Mar. 25, 2022) (denying remand because defendant had sufficiently pled amount in controversy exceeds jurisdictional requirement in employment case because plaintiff was asking to recoup employment pay on contract, for emotional-stress damages and fees, and punitive damages as well as attorney fees and costs.)

## III.     ALL OTHER REMOVAL REQUIREMENTS ARE SATISFIED

18.     This Notice of Removal is timely filed. The notice of removal of a civil action or proceeding "shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter." 28. U.S.C. § 1446(b)(1).

19.     Defendant obtained the Complaint via email from counsel for Plaintiff on March 21, 2022. Service was completed on April 11, 2022. The Defendants filed this Notice of Removal on April 13, 2022. Removal is therefore timely. *See* 28 U.S.C. § 1446(b)(1).

20.    Plaintiff's state court action was commenced in the Superior Court of the State of California in and for the County of San Francisco, and under 28 U.S.C. §§ 84(a) and 1446(a), may be removed to this United States District Court for the Northern District of California, which embraces San Francisco within its jurisdiction.

21.    The bar on removal in 28 U.S.C. § 1441(b)(2) does not apply because Celonis is not a citizen of California.

22.    By filing this Notice of Removal, Defendant does not waive any defense that may be available to it and Defendant expressly reserves all such defenses.  If any question arises as to the propriety of the removal to this Court, Defendant requests the opportunity to present a brief and oral argument in support of their position that this case has been properly removed.  Defendant also reserves all rights to present briefs and arguments concerning forum selection and choice of law.

23.    Written notice of the filing of this Notice of Removal will be given to the adverse parties and the California state court as required by 28 U.S.C. § 1446(d).

<u>**CONCLUSION**</u>

WHEREFORE, Defendants hereby remove this action to the United States District Court in the Northern District of California.

DATED: April 13, 2022

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: <u>/s/ *Lance A. Etcheverry*</u>
Lance A. Etcheverry
*Attorneys for Celonis, Inc.*

NOTICE OF REMOVAL OF ACTION                                                    CASE NO.:_____

# EXHIBIT 1

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CELONIS, INC., a Delaware corporation; and DOES 1 through 20; inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
SHAWN O'CONNELL, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: *(Número del Caso):* |
|---|---|
| *(El nombre y dirección de la corte es):*  San Francisco Superior Court, 400 McAllister Street, San Francisco, CA  94102 | **CGC-22-598686** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Tamarah Prevost, Cotchett, Pitre & McCarthy, LLP, 840 Malcolm Road, Suite 200, Burlingame, CA 94010  Tel: 650-697-6000

| DATE: | Clerk, by | , Deputy |
|---|---|---|
| *(Fecha)* **03/15/2022** | *(Secretario)* **KAREN VALDES** | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

Tamarah P. Prevost (SBN 313422)
Kevin J. Boutin (SBN 334965)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
tprevost@cpmlegal.com
kboutin@cpmlegal.com

Robert S. Arns, State Bar No. 65071 (rsa@arnslaw.com)
Jonathan E. Davis, State Bar No. 191346 (jed@arnslaw.com)
Katherine A. Rabago, State Bar No. 333374 (kar@arnslaw.com)
**THE ARNS LAW FIRM**
A Professional Corporation
515 Folsom St., 3rd Floor
San Francisco, CA 94109
Tel: (415) 495-7800
Fax: (415) 495-7888

*Attorneys for Plaintiff*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**03/14/2022**
**Clerk of the Court**
BY: KAREN VALDES
Deputy Clerk

**CGC-22-598686**

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| **SHAWN O'CONNELL, an individual,** | **Case No. _____** |
| Plaintiff | **COMPLAINT FOR:** |
| v. | 1. **Intentional Misrepresentation** |
| | 2. **False Promise** |
| **CELONIS, INC., a Delaware corporation; and DOES 1 through 20, inclusive,** | 3. **Negligent Misrepresentation** |
| | 4. **Declaratory Relief** |
| | 5. **Breach of Contract** |
| Defendants. | 6. **Promissory Estoppel** |
| | 7. **Retaliation in Violation of FEHA (Cal. Gov. Code § 12940 et seq.)** |
| | 8. **Retaliation in Violation of Cal. Lab. Code § 1102.5** |
| | 9. **Violation of UCL (Cal. Bus. & Prof. Code § 17200 et seq.)** |
| | 10. **Wrongful Termination in Violation of Public Policy** |

1

**TABLE OF CONTENTS**

2

**Page**

3   I.    INTRODUCTION ................................................................................................1

4   II.   JURISDICTION AND VENUE ........................................................................3

5   III.  CONDITIONS PRECEDENT TO FILING ACTION ....................................3

6   IV.   THE PARTIES ...................................................................................................4

7         A.    Plaintiff .....................................................................................................4

8         B.    Defendant ..................................................................................................4

9   V.    FACTUAL BACKGROUND .............................................................................5

10        A.    Celonis Recruits Mr. O'Connell Away from His Secure and Lucrative Position
11              with Salesforce ..........................................................................................5

12        B.    Celonis Offers Mr. O'Connell Employment and 3,000 Restricted Stock Units
              Upon Hire ..................................................................................................5

13        C.    Mr. O'Connell Establishes Himself as a Top Performer at Celonis ...............6

14        D.    Mr. O'Connell Repeatedly Requests Documentation of His Equity Position,
15              and Celonis Ignores or Rejects His Requests ............................................7

16        E.    Mr. O'Connell Again Seeks Clarification on His RSUs, and Celonis Finally
              Informs Him That It Would Only Honor 1/10th of What It Promised Him ...........8

17        F.    Celonis CRO Miguel Milano Confronts Mr. O'Connell with Unfounded
18              Accusations ...............................................................................................10

19        G.    While Repeatedly Raising Issues About His Compensation, Mr. O'Connell
              Also Refuses to Testify in Celonis' Favor in a Sexual Assault Case Against
20              the Company .............................................................................................10

21        H.    Mr. O'Connell Internally Reports His Concerns Regarding Celonis' Business
              Practices Designed to Falsely Inflate Revenues in Advance of an IPO ...............11

22        I.    Celonis Forces Mr. O'Connell Out of the Company, Fashioning Its
23              Termination as a "Choice" .......................................................................12

24              1.    Celonis Lays the Groundwork for a Pretextual Performance
                    Improvement Plan ..........................................................................12

25              2.    Celonis Issues the Pretextual Written PIP ..................................14

26              3.    Celonis Constructively Terminates Mr. O'Connell By Forcing Him
27                    to Choose Either to be Placed on a PIP, or Accept Termination and a
                    Release of Claims. .........................................................................15

28

**VI.    CAUSES OF ACTION** ................................................................................15

    FIRST CAUSE OF ACTION
    INTENTIONAL MISREPRESENTATION.................................................15

    SECOND CAUSE OF ACTION
    FALSE PROMISE .......................................................................................18

    THIRD CAUSE OF ACTION
    NEGLIGENT MISREPRESENTATION.......................................................19

    FOURTH CAUSE OF ACTION
    DECLARATORY RELIEF ..........................................................................21

    FIFTH CAUSE OF ACTION
    BREACH OF CONTRACT...........................................................................22

    SIXTH CAUSE OF ACTION
    PROMISSORY ESTOPPEL..........................................................................24

    SEVENTH CAUSE OF ACTION
    RETALIATION IN VIOLATION OF FEHA
    CAL. GOV. CODE § 12940 *ET SEQ.* ......................................................25

    EIGHTH CAUSE OF ACTION
    RETALIATION IN VIOLATION OF CAL. LAB. CODE § 1102.5...............26

    NINTH CAUSE OF ACTION
    VIOLATION OF THE UNFAIR COMPETITION LAW,  CAL. BUS. &
    PROF. CODE § 17200 *ET SEQ.*................................................................27

    TENTH CAUSE OF ACTION
    WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY .......30

**VII.   PRAYER FOR RELIEF**.................................................................................31

**VIII.  JURY DEMAND** ...........................................................................................32

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

# I.     INTRODUCTION

1.      In 2018, Celonis, Inc. ("Celonis" or "the Company") initiated efforts to recruit Shawn O'Connell away from a lucrative position with Salesforce where he had enjoyed great success. Unable to match the salary Mr. O'Connell earned at Salesforce, Celonis instead offered him a significant equity grant of 3,000 restricted stock units ("RSUs"). Celonis made this offer after multiple verbal and written negotiations regarding the terms of Mr. O'Connell's compensation at the Company. Celonis communicated to Mr. O'Connell that the Company, whose shares were then valued at approximately $70, anticipated growing in value significantly, and that this was Mr. O'Connell's opportunity to get in on the ground floor. Mr. O'Connell would never have left his lucrative position at Salesforce were it not for this equity grant offer, which is written into the body of his Offer Letter.

2.      Soon after starting with Celonis, and repeatedly for nearly two years, Mr. O'Connell sought basic information and documents about the equity program the Company purportedly offered to all employees, and for a statement of his equity position specifically. For example, Mr. O'Connell asked multiple times for the "Celonis 2018 Restricted Stock Unit Plan" referenced in his Offer Letter. But Celonis consistently evaded his inquiries, punting to personnel in various departments and at different levels, but never providing him a response to even the most basic foundational questions.

3.      On June 2, 2021, frustrated with the Celonis' lack of transparency, Mr. O'Connell escalated his concerns to Celonis' co-CEO, Bastian Nominacher. A week later on June 9, 2021, Celonis communicated to Mr. O'Connell – for the first time – that rather than the 3,000 RSUs explicitly granted to him in his Offer Letter, the Company (relying on a bad faith interpretation of a footnote) took the position it only gave him *300* RSUs upon hire. Uncoincidentally, by the time Celonis communicated its untenable position to Ms. O'Connell, Celonis' share value had increased more than 500% since his onboarding. Celonis' post hoc interpretation divested Mr. O'Connell of significant equity and value.

4.      It turns out Celonis' employee stock program never actually existed. In violation of federal securities law (described below), the "Celonis 2018 Restricted Stock Unit Plan" Celonis

referenced in Mr. O'Connell's employment Offer Letter (and communicated with the aim of recruiting him) <u>did not exist when he was hired</u>. It may not even have existed when it wrongfully terminated him. Highlighting the manipulative nature of Celonis' actions, however, the Company did for a short time offer to "permit" him to sell back a portion of his "shares" – conditioned, unsurprisingly, on him executing a complete release of his claims against Celonis.

5.      Celonis' conduct as a purported "stock administrator" was deceptive, fraudulent, and intentionally designed to lure Mr. O'Connell away from Salesforce with a promise of equity that Celonis had no intention of honoring.

6.      Running parallel to the events described above, Mr. O'Connell learned of and opposed Celonis' business practices he believed were unlawful, and designed to falsely inflate revenue in violation of federal securities laws. Specifically, Celonis conducted business transactions during late 2020 and 2021 requiring a given client to spend millions in "annual recurring revenue" for the opportunity to invest millions of dollars in the Company ahead of its anticipated Initial Public Offering ("IPO"). This tactic was designed to create the illusion of hyper-growth and distort Celonis' valuation to, among others, the investing public. Mr. O'Connell's opposition to this practice risked the Company's bottom line, and more importantly, could attract legal regulatory scrutiny and hinder the Company's IPO.

7.      Separately, in April 2021, Celonis' outside legal counsel interviewed Mr. O'Connell as part of the Company's investigation of an alleged sexual assault. The victim was Mr. O'Connell's direct report. In response to the investigator's questions, Mr. O'Connell offered truthful information and a perspective that Celonis knew would be damaging in any eventual litigation on the sexual assault claims. Celonis terminated the victim in May. On June 4, 2021, Celonis' Legal Director contacted Mr. O'Connell regarding the resulting sexual assault case, seeking evidence to corroborate Celonis' defense. But Mr. O'Connell again refused to tow the company line, providing documentation and statements that were generally adverse to the Company's position in the case. Mr. O'Connell was one of few people who had first-hand knowledge of material information that appeared to corroborate the victim's allegations.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

COMPLAINT                                                                                          2

8.      In June 2021, Celonis swiftly carried out a series of retaliatory actions culminating in Mr. O'Connell's termination. In a June 9 phone call, Celonis Chief Revenue Officer, Miguel Milano, baselessly admonished Mr. O'Connell, bizarrely asked him how many Celonis shares he owned, and told him he had "better stay" at Celonis if he wants to continue vesting shares. On June 15, Mr. Milano and Celonis Human Resources representative, Alexandra Brunetti, informed Mr. O'Connell that he had received negative "feedback" (from undisclosed sources and about unspecified events). They informed Mr. O'Connell that, due to this feedback, he could "choose" to either be placed on a performance improvement plan overseen by the overtly hostile Mr. Milano, or be terminated with a severance package requiring a full release of claims against the Company and an airtight non-disclosure agreement.

9.      Mr. O'Connell asked for more time to consider this career-changing and oppressive choice. Eleven days later, on July 26, 2021, Celonis terminated him.

## II.      JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over all causes of action asserted herein, and the amount in controversy exceeds the jurisdictional minimum of this Court.

11.     Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their dealings and transactions in San Francisco County and by having caused injuries through their acts and omissions within this County to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in San Francisco County because Celonis is a corporation or association, the contract at issue here was made or was to be performed in this County and the obligation or liability arose in this County.

## III.      CONDITIONS PRECEDENT TO FILING ACTION

13.     On August 20, 2021, Mr. O'Connell filed a complaint of discrimination with the Department of Fair Employment and Housing.

/ / /

/ / /

/./.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

COMPLAINT                                                                                                          3

## IV.    THE PARTIES

### A.    Plaintiff

14.    Plaintiff Shawn O'Connell is a San Francisco Bay Area native, and has lived in Danville, California with his wife and three children for the past 18 years.

15.    Mr. O'Connell has a well-established upward trajectory of success in the sales industry. After spending a decade at EMC Corporation, he held regional sales manager positions at Trace3, and BMC Software, where he led a team of Strategic Global Account managers. He ultimately landed at Salesforce in a role as VP of Sales for over four years, again, marked by upward success. Mr. O'Connell was a member of Salesforce's President's Club the year he left, consistently exceeded his sales quotas, and thoroughly enjoyed his role. The position also provided substantial compensation and security that Mr. O'Connell – as the sole breadwinner – relied on to support his wife and three children.  Mr. O'Connell was diagnosed with diabetes in 1999 and has relied on employer-sponsored healthcare to provide health insurance for him and his dependents.

### B.    Defendant

16.    Defendant Celonis is a software company founded in Munich, Germany, with its United States headquarters in New York. Celonis claims it "provides companies a modern way to run their business processes entirely on data and intelligence. [Celonis] pioneered the process mining category 10 years ago when [it] first developed the ability to automatically X-ray processes and find inefficiencies."[1]

17.    Celonis employs around 1,100 people across 12 locations. Celonis recently raised $1 billion in funding and is valued at $11 billion. Celonis has repeatedly represented – to the public and to its employees – that it plans to conduct an IPO in the very near future. For example, Celonis conducted all-hands, company-wide calls in 2020 and early 2021 detailing the equity program, estimated stock values, and plans for a future IPO.

/././

/././

---

[1] *See Our Company, We're Celonis*, available at https://www.celonis.com/company/

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

## V.     FACTUAL BACKGROUND

### A.     Celonis Recruits Mr. O'Connell Away from His Secure and Lucrative Position with Salesforce

18.     In early July 2018, Celonis began focused efforts to recruit Mr. O'Connell away from his secure and lucrative Salesforce position to join its ranks. Celonis and its retained professional recruiting firm solicited Mr. O'Connell directly, first via LinkedIn direct messaging and then via email. Hesitant to potentially jeopardize his position with Salesforce, Mr. O'Connell was initially reluctant to entertain the pitch. But Celonis portrayed itself as an exciting up-and-coming company that Mr. O'Connell could expect to grow significantly in the future. During his application process, several Celonis representatives and recruiters explicitly promised that if hired, he would be granted a generous equity stake in the Company which he could expect to appreciate significantly over time.

19.     Celonis' promise of equity was also based on the fact that Celonis was unable to pay Mr. O'Connell base salary commensurate with what he received at Salesforce.  The equity upside, according to Celonis, more than made up for it – particularly considering Celonis' expected growth and anticipated future public offering.

20.     Based on these representations from various Celonis personnel, Mr. O'Connell engaged in Celonis' recruitment efforts and agreed to apply for a sales role at the Company.

### B.     Celonis Offers Mr. O'Connell Employment and 3,000 Restricted Stock Units Upon Hire

21.     On October 26, 2018, Celonis presented Mr. O'Connell with a formal offer setting forth the terms of employment with Celonis ("Offer Letter"). A copy of the offer is attached hereto as **Exhibit 1**. The offer included $200,000 in annual base salary and $200,000 in annual target commissions, and granted Mr. O'Connell 3,000 Restricted Stock Units ("RSUs"), each corresponding to one share of Celonis stock and "subject to the terms and conditions set forth in the Celonis 2018 Restricted Stock Unit Plan and the standard form of Restricted Stock Unit Agreement thereunder."[2]

---

[2]  The 3,000 RSUs were subject to a customary 1-year vesting "cliff" and vested quarterly thereafter. *See* Ex. 1.

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

22.     As is common in onboarding discussions of this type, there was some back and forth negotiation between Celonis and Mr. O'Connell about the quantity of RSUs (i.e., Celonis initially offered Mr. O'Connell an onboarding grant of 1,500 RSUs, which it increased later to 3,000). The parties' discussions were often memorialized in email correspondence. Ultimately, Mr. O'Connell accepted Celonis' offer of 3,000 RSUs, which on information and belief was authorized by the Company. This agreement was written and memorialized in the Offer Letter that Mr. O'Connell signed. *See* **Ex. 1**.

23.     At the time the final Offer Letter was ultimately transmitted to Mr. O'Connell and throughout the recruitment process, Celonis, its outside recruiter, and other agents including Chris Bernhoft, Mr. O'Connell's hiring manager affirmed, orally and in writing, that Celonis was granting Mr. O'Connell 3,000 RSUs upon employment. When Mr. O'Connell received the finalized Offer Letter, he recognized it as consistent with each of these prior assurances and signed it on that basis.

**C.     Mr. O'Connell Establishes Himself as a Top Performer at Celonis**

24.     Immediately and for nearly three years at Celonis, Mr. O'Connell was a strong performer. He exceeded revenue and profit goals and partner sales development, recruited and retained strong sales talent, and implemented "go to market" strategies that enhanced customer success and produced sustainable growth.

25.     He was a top performer locally, and in his first full quarter Mr. O'Connell closed a significant deal with Ingram Micro, Celonis' largest SaaS order in the West at that point, bringing in $680,000 per year in annual recurring revenue ("ARR"). Within his first year, he was rewarded with a performance-based pay increase, and he closed an account that promised Celonis $1.3 million in ARR, taking the West Hi-Tech business from zero ARR in 2018 to approximately $5 million in 2021.

26.     Mr. O'Connell was also an excellent leader: he is well-liked by his colleagues, and to his delight, one of his direct reports was indicted into Celonis' President's Club under his supervision. There can be no reasonable dispute about Mr. O'Connell's strong performance at the Company before he was wrongfully terminated.

1

2

### D.    Mr. O'Connell Repeatedly Requests Documentation of His Equity Position, and Celonis Ignores or Rejects His Requests

3

4       27.     Almost immediately after beginning work at Celonis and multiple times between

5  2019 and 2021, Mr. O'Connell requested (orally and in writing) the underlying "Celonis 2018

6  Restricted Stock Unit Plan and standard form of Restricted Stock Unit Agreement" expressly

7  referenced in his Offer Letter, and which the Company had not provided to him. *See* **Ex. 1**. He

8  also asked for formal documentation reflecting his 3,000 RSUs, his vesting schedule, or any other

9  foundational documents reflecting his equity position. Celonis never answered his questions or

   provided him with documents responsive to his requests.

10      28.     For example, on February 4, 2020, Mr. O'Connell emailed his primary Human

11 Resources lead, Laura Coluccio, who forwarded his inquiry to Celonis' then-Senior Vice

12 President of Finance, Fabian Veit, asking for the 2018 stock agreement referenced in his Offer

13 Letter. Mr. O'Connell received no response from any of these individuals, or anyone else at

14 Celonis. Still seeking these foundational documents, Mr. O'Connell asked his manager Chris

15 Bernhoft, who had handled Mr. O'Connell's hiring and was certainly aware of the specific RSU

16 grant offered to him. Mr. Bernhoft similarly could not provide a substantive response, but

17 forwarded the request to then-CFO Guido Torrini for assistance.

18      29.     On March 17, 2021, Mr. O'Connell wrote to the head of North American Human

19 Resources, Alexandra Brunetti, hoping that she could lend clarity and closure to his circuitous

20 quest for information. Ms. Brunetti responded that she "did not know about any employee RSU

21 program," and could not answer his questions, but vaguely promised to contact Celonis' "Equity

22 Rewards team" on his behalf. Given that Ms. Brunetti was Celonis' HR representative for an

23 entire continent of Celonis' employees, this response was deeply troubling.

24      30.     And nearly three months later, on June 2, 2021, still having heard nothing from

25 anyone at Celonis, Mr. O'Connell emailed the head of the Equity Rewards Program, Ekaterina

26 Potter, detailing his multiple unsuccessful requests for basic documentation over nearly two years,

27 asking one more time for a response, and to be included in the June tender offer. That same day,

28 on June 2, 2021, Mr. O'Connell elevated his requests and report one more time – notifying

Celonis' co-CEO Bastian Nominacher of the Company's utter failure to provide documentation reflecting Mr. O'Connell's equity. As set forth below, this June 2 report came in striking temporal proximity to Celonis' wrongful termination of Mr. O'Connell.

31.     From early 2019 to present, Celonis has never responded to Mr. O'Connell's requests for the 2018 stock agreement referenced in his Offer Letter, or any other foundational documents required under federal laws. That is because, on information and belief, these documents do not exist. Celonis' "employee equity program" was a sham – intentionally designed to lure talented employees away from their jobs, so Celonis could benefit from the fruits of their labor without any intention of honoring the promises of equity it explicitly made to them. *Not only* did Celonis fail to respond to Mr. O'Connell's seriatim requests for information, *no one ever told him that the documents he was requesting did not exist*. Celonis' conduct was deceptive, fraudulent, and in violation of laws governing employer-administered stock plans.

**E.     Mr. O'Connell Again Seeks Clarification on His RSUs, and Celonis Finally Informs Him That It Would Only Honor 1/10th of What It Promised Him**

32.     On June 9, 2021, for the first time since his employment in November 2018, Celonis shared with Mr. O'Connell that, based on its untenable post-hoc reading of the Offer Letter, it actually gave him only 300, rather than 3,000 RSUs at the time of hiring.

33.     Mr. O'Connell only learned of Celonis' position because in June 2021, Celonis announced a "tender offer" to all employees permitting them to sell 15% of their vested shares. It was then that Mr. O'Connell also learned (also for the first time), that he was one of just four employees who were granted RSUs rather than stock options, through an inexplicable (and apparently not documented) covert arrangement.

34.     According to Celonis, relying on a footnote in Mr. O'Connell's Offer Letter, it only ever gave Mr. O'Connell 1/10th of what it promised in (1) the body of the Offer Letter, (2) repeated oral representations from Celonis representatives and recruiters leading up to the execution of the offer letter, (3) written emails before and after signing the Offer Letter.

35.     The footnote upon which Celonis relied for its untenable interpretation states that "the number of RSUs specified assumes the completion of the *currently executed* 1-for-10

forward stock split." (emphasis added). *See* **Ex. 1**.

36.     On June 9, 2021, Ms. Brunetti told Mr. O'Connell that because the 1-for-10 forward stock split referenced in the footnote apparently "never happened," Mr. O'Connell only received 300 RSUs at the time of hiring, not the 3,000 explicitly stated in the body of the letter. After a 20:1 stock split on January 28, 2020, Celonis therefore calculated that Mr. O'Connell owned only 6,000 RSUs, rather than the 60,000 he was led by Celonis, up to that point, to believe he held.[3]

37.     Ms. Brunetti informed Mr. O'Connell that he was permitted to participate in the Company-wide tender offer to sell 15% of his vested shares back to the Company for cash. However, according to Celonis' interpretation of his total shares, she told him that he had vested approximately 56% (or 3,375) of his 6,000 total shares as of June 9, 2021 and Celonis would therefore permit him to sell 506 of them back to the Company.

38.     Based on Celonis' tender offer to Mr. O'Connell, it is undisputed that as of June 9, 2021, he had vested 56% of his shares. However, Mr. O'Connell disagreed strongly with Celonis' interpretation of his *total* RSUs which were ten times less than what it gave him, to leave Salesforce.

39.     Moreover, in order for Mr. O'Connell to participate in the tender offer, Celonis required him to "relinquish[] any claim you may have against the Company or its affiliates in relation to the Surrendered RSUs." That is, Celonis attempted to force Mr. O'Connell to release claims against the Company in order to receive the benefit of the tender offer, which was offered to all other Celonis employees.

/././

/././

---

[3] Celonis also contends that the vesting of Mr. O'Connell's RSUs was contingent on a 1) service-based requirement (which it is undisputed that he met), and 2) a liquidity event of some kind. Similarly, the Offer Letter grants Mr. O'Connell his RSUs "subject to the terms and conditions set forth in the Celonis 2018 Restricted Stock Unit Plan and the standard form of Restricted Stock Unit Agreement thereunder." As noted, Celonis did not provide any 2018 stock agreements at the time of hiring, and has consistently rejected numerous attempts by Mr. O'Connell to obtain the underlying stock agreement or other documents. Any reliance by Celonis on rights contained in a stock agreement that either did not exist, or that it refused to provide to Mr. O'Connell, highlights its bad faith.

**F.     Celonis CRO Miguel Milano Confronts Mr. O'Connell with Unfounded Accusations**

40.     The same day he learned of Celonis' position regarding his RSUs, June 9, 2021, Mr. O'Connell held a call with Celonis' CRO and Co-owner, Miguel Milano, to discuss several matters.

41.     The call began productively, as the two discussed upcoming plans for the team. Then, in an abrupt about-face, Mr. Milano deployed a barrage of accusations, first bizarrely telling Mr. O'Connell: "I believe you hate me." Confused, Mr. O'Connell did not respond and attempted to refocus the conversation on other neutral matters. Undeterred, Mr. Milano followed up by saying: "your team hates you, and they're celebrating that you're changing roles," and repeatedly asking him: "Who on your team hates you?" Oddly, Mr. Milano concluded this part of the conversation – after claiming to know the sentiments held by Mr. O'Connell's team – by asking for the names of the people on his team. Mr. O'Connell understood these accusations to be baseless but was genuinely perplexed by this exchange.

42.     Mr. Milano then asked Mr. O'Connell how many options he had in the Company. Mr. O'Connell stated he had RSUs, and not options, and Mr. Milano responded with surprise, telling Mr. O'Connell his "RSUs are worth a lot of money" and that he had "better stay" at Celonis if he wants to continue vesting. Mr. O'Connell interpreted these comments as a warning.

**G.     While Repeatedly Raising Issues About His Compensation, Mr. O'Connell Also Refuses to Testify in Celonis' Favor in a Sexual Assault Case Against the Company**

43.     Running parallel to the foregoing circumstances, earlier in 2021 a Celonis sales employee and direct report of Mr. O'Connell (referred to herein anonymously as "X"), notified the Company that they were a victim of sexual assault at the hands of another Celonis employee at a company event. Mr. O'Connell was X's direct supervisor.

44.     On April 7, 2021, Ms. Brunetti contacted Mr. O'Connell, informing him that Celonis wished to interview him in connection with its investigation into X's sexual harassment or assault claims. The next day, Mr. O'Connell sat for an interview in response to questions posed by Celonis' outside investigator, from Fisher & Phillips, about his supervision of X. Among other

things, Mr. O'Connell expressed that X was generally a positive performer, and that after the alleged sexual assault, they returned to work virtually a "different person" emotionally and mentally, and with noticeable effects to their demeanor. In other words, Mr. O'Connell corroborated X's version of events and provided a perspective that could be damaging if offered in any eventual litigation of X's claims.

45.     On June 4, 2021, Celonis Legal Director, Ron Katcher, contacted Mr. O'Connell to inform him that there was an active investigation into X's claims, and to seek any documentation, including emails, in Mr. O'Connell's possession concerning X. Specifically, Mr. Katcher sought support such as negative performance reviews that could be used to justify Celonis' decision to terminate X, notwithstanding X's sex assault claims. Mr. O'Connell *again* provided feedback that did not support Celonis' defense in X's case. Celonis terminated X.

46.      As one of the only remaining employees with any personal knowledge of X's performance (and the employee who directly supervised him), the Company needed Mr. O'Connell's testimony to support its defense, if X were to bring a future legal case against the Company.

**H.     Mr. O'Connell Internally Reports His Concerns Regarding Celonis' Business Practices Designed to Falsely Inflate Revenues in Advance of an IPO**

47.     Separate from the foregoing events, Mr. O'Connell learned the Company was engaging in what he reasonably believed were serious securities violations in connection with its potential IPO and other stock offerings, including violations of Rule 10b-5 of the Securities Exchange Act which prohibits the employment of manipulative or deceptive practices in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. Specifically, Mr. O'Connell learned that Celonis conducted business transactions that closed in late 2020 and 2021 that require a client to agree to spend millions in "annual recurring revenue" ("ARR").

48.     In return for several clients' increased ARR commitment, Celonis "allowed" the client to invest millions of dollars in the company ahead of its IPO. This activity creates the false illusion of hyper-growth, raises demand for Celonis products, artificially inflates revenues, and

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

ultimately overstates Celonis' valuation in advance of its forthcoming IPO and tender offer,[4] in violation of SEC regulations. Celonis undertook this scheme specifically to falsely (and deceptively) increase the perceived value of its worth in advance of an upcoming IPO, to drive stock value and shareholder demand.

49.     Repeatedly during his employment, and as recently as March 2021 Mr. O'Connell reported his belief that Celonis' conduct violated various securities laws requiring truthful disclosures to potential investors. He repeatedly shared his views with his supervisor Chris Bernhoft, and others, which was problematic for Celonis in light of the Company's well-publicized anticipated upcoming IPO.

50.     Indeed, the Company made several written and oral representations about its anticipated IPO in the near term. It told employees clearly that they should continue working at the Company to "reap the benefits" of working at a pre-IPO company; that Celonis was increasing in value every day; and that the IPO would be an enormous source of wealth for anyone participating in Celonis' "employee stock plan." Celonis told Mr. O'Connell and others directly that it expected its stock to "double in value" between June and when it expected to conduct an IPO in early 2022. In an all-hands meeting around April 2021, Celonis announced that all eligible employees would be made a tender offer of $369 per share to sell up to 15% of vested equity in exchange for cash compensation (as described above).

**I.     Celonis Forces Mr. O'Connell Out of the Company, Fashioning Its Termination as a "Choice"**

    **1.     Celonis Lays the Groundwork for a Pretextual Performance Improvement Plan**

51.     Approximately a week after learning Celonis took the position that it granted him only 300 RSUs (and just 11 days after Mr. O'Connell refused to provide favorable testimony in Celonis' investigation of X's sex assault claims), on June 15, 2021, Mr. O'Connell unexpectedly received a calendar invite titled "feedback" from Mr. Milano. When he called in, Celonis HR

---

[4] Section 14(e) of the Securities Exchange Act of 1934 provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . ." 15 USC § 78n(e).

representative Ms. Brunetti was surprisingly in attendance. Mr. Milano informed Mr. O'Connell he had "violated company policy" for being "insubordinate" – without identifying any specifics.

52.     Having received *zero* negative feedback from *anyone* at Celonis in over two years of employment, Mr. O'Connell was genuinely confused by this news.[5]

53.     Celonis then told Mr. O'Connell he had two "options": *First*, Mr. O'Connell could be immediately placed on a 30-day Performance Improvement Plan ("PIP") premised on his purported (and vague) "subordination." Mr. Milano (who had just launched baseless allegations against and senselessly berated him) would "oversee" Mr. O'Connell's performance on the PIP and determine his compliance with its terms. Mr. Milano told Mr. O'Connell if he did not comply with the PIP in any way, he would be terminated with no severance and no benefits.

54.     Aside from being pretextual, Mr. O'Connell understood this "PIP" to be illusory: he knew that if he accepted it, Celonis would terminate him (likely before the end of the 30-day period), regardless of his actual performance, and with no health insurance or severance. In that scenario, Mr. O'Connell would be out of a job, with no income, and with a termination on his record while he scrambled to find a replacement position.

55.     Celonis knew in presenting these options that Mr. O'Connell relied strongly on his employment income, and that he was the sole breadwinner supporting his wife and three children. Celonis also knew that at that time, Mr. O'Connell was diabetic and required Celonis' employer-sponsored healthcare coverage for his ongoing medical treatment.

56.     The *second* "option" presented by Celonis was for Mr. O'Connell to "accept" termination, in exchange for signing a full release of claims and non-disclosure agreement, and "continued vesting" of his unvested shares until September 15. Celonis refused to provide the amount of the severance offer. However, Celonis maintained its view that he was only entitled to $1/10^{th}$ of his actual equity granted to him under the plain terms of his offer letter (6,000 rather than the 60,000 RSUs.)

---

[5] Mr. O'Connell also asked whether the call was being recorded. Mr. Milano's bizarre response was that a recording was not necessary because he [Milano] was Ms. Brunetti's witness, and Ms. Brunetti was his. When Mr. O'Connell asked whether he could have a witness present, neither individual responded.

57.     Celonis' absurd proposal was transparently aimed at forcing Mr. O'Connell out of the Company immediately, obtaining a release of claims and a binding NDA from him, with the hope that doing so would deter him from providing favorable testimony to X in any upcoming litigation of X's case, or sharing with the public or regulatory agencies the securities violations that Celonis knew Mr. O'Connell witnessed, including with its own employee stock plan. Celonis sought to secure Mr. O'Connell's silence regarding the Company's violations of federal securities laws – which Mr. O'Connell was one of the last remaining employees to personally witness. Celonis likewise sought to avoid its obligation to grant Mr. O'Connell the RSUs it promised him explicitly in his Offer Letter, while forcing him to release any future claims to the equity (or other compensation) he was entitled to.

58.     Mr. O'Connell was perplexed by these "options." On the one hand, Celonis was relaying to him that he had committed a "terminable offense" without providing any details. On the other hand, it was offering him a severance package, despite his purported terminable offense. In Mr. O'Connell's mind, Celonis' statements could not be reconciled.

59.     Mr. O'Connell understood Celonis' "proposal" as a no-win situation. Celonis presented these options to him over the phone but refused to provide them in writing. It forced him to respond within four days of that call, later agreeing to give him four additional days.

### 2.     Celonis Issues the Pretextual Written PIP

60.     Two days after the above-described meeting, on June 17, Ms. Brunetti provided Mr. O'Connell a written PIP, reflecting similarly vague accusations as mentioned in the June 15 call.

61.     While the PIP concerned Mr. O'Connell's 2021 sales performance, it was prepared with more than three months remaining in fiscal year 2021, and therefore failed to capture his performance. It is well-known in the sales industry that the majority of business closes at the end of a fiscal (or calendar) year. And Mr. O'Connell was being evaluated (and criticized) using sales metrics for those in management positions, but at that point in time he was in an individual sales role.

62.     Notably, the PIP also claimed Mr. O'Connell "show[ed] insubordination towards [his] managers" or otherwise "undermin[ed] them." No specific event, time, or behavior are identified, but Mr. O'Connell understood this "insubordination" allegation to refer to his refusal to provide favorable testimony to the Company concerning X, and his repeated questioning to the Company about his equity position.

63.     And the PIP closed with a threat that Mr. O'Connell's failure to meet its requirements "w[ould] result in further disciplinary action up to and including termination," as supervised by Mr. Milano, the same manager who had recently baselessly attacked Mr. O'Connell for the first time.  The customary purposes of a PIP were conspicuously absent: there was no action plan intended to foster Mr. O'Connell's continued success at the Company.

### 3.     Celonis Constructively Terminates Mr. O'Connell by Forcing Him to Choose Either to be Placed on a PIP, or Accept Termination and a Release of Claims.

64.     Compounding the pretextual nature of the two "options" presented by Celonis, the Company forced Mr. O'Connell to "choose" between "accepting" the PIP or termination pursuant to the severance terms by June 21, 2021 (six days later), without even providing him any formal severance terms in writing. It was impossible to evaluate such a decision without knowing what he was being offered.

65.     While Ms. Brunetti sent Mr. O'Connell an email on June 17 paraphrasing a few of Celonis' proposed severance terms, it was not until the afternoon of June 21 – i.e., Celonis' deadline for Mr. O'Connell to decide – that Ms. Brunetti provided a draft severance agreement (backdated to June 18) for Mr. O'Connell's review.

66.     On July 26, 2021, when Mr. O'Connell had not accepted either of the two "options," Celonis terminated him.

## VI.   CAUSES OF ACTION

<u>**FIRST CAUSE OF ACTION**</u>
**INTENTIONAL MISREPRESENTATION**

67.     Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

68.     Celonis made various representations to Mr. O'Connell as alleged herein, including without limitation that:

    a.     It was administering a legitimate, approved employee stock plan, referred to by Celonis as the "Celonis 2018 Restricted Stock Unit Plan";

    b.     There was an underlying legitimate and finalized stock agreement, the terms of which governed the "Celonis 2018 Restricted Stock Unit Plan"; according to Celonis, this document was entitled "standard form of Restricted Stock Unit Agreement" or "applicable RSU agreement";

    c.     The 1-for-10 forward stock split referenced in the footnote of Mr. O'Connell's Offer Letter had already happened, or was close to being completed, at the time he accepted Celonis' offer of employment;

    d.     Celonis would grant Mr. O'Connell 3,000 RSUs upon his acceptance of the Offer;

    e.     Celonis, as a legitimate stock plan administrator, would respond to reasonable requests for information and documents; and

    f.     Mr. O'Connell and other employees would earn significant income through Celonis' stock value increases, if they continued their employment at the Company.

69.     Each of these representations was false.

70.     Celonis did not intend to grant Mr. O'Connell 3,000 RSUs, and knew that the foregoing representations were false when they were made, and/or Celonis made the representations recklessly and without regard for their truth. This is evident considering the Company, *inter alia*, (a) never responded to Mr. O'Connell's reasonable requests for information about his equity; (b) never provided any underlying stock documents referenced in the Offer Letter at Mr. O'Connell's request; (c) has repeatedly changed its position on the nature of his vested or unvested shares (and the attendant triggering events required for that vesting), and whether the Offer Letter did, or did not, grant Mr. O'Connell shares; and (d) had not "executed" a 1-for-10 stock split prior to extending the Offer Letter to Mr. O'Connell.

71.    On information and belief, either the 2018 Stock Agreement referenced in Celonis' offer letter does not exist, or Celonis is intentionally concealing it from Mr. O'Connell. Either way, Celonis had no intention to honor the grant of 3,000 RSUs in its Offer Letter to grant Mr. O'Connell 3,000 RSUs upon employment.

72.    Mr. O'Connell reasonably relied on Celonis' representation that he would receive 3,000 RSUs upon hire. Mr. O'Connell had no reason to doubt (a) that Celonis was administering a legitimate, lawful, and compliant employee stock plan, (b) that Celonis was offering 3,000 RSUs in good faith, or (c) that the "currently executed" stock split referenced in the Offer Letter had already occurred.

73.    Mr. O'Connell has been harmed as alleged herein, including in that he did not receive 3,000 RSUs, which would have become 60,000 RSUs following a 20:1 split in Celonis' share price. Instead, Celonis falsely claims that Mr. O'Connell was entitled to only 300 RSUs upon hire, which became 6,000 RSUs after the 20:1 stock split.

74.    Additionally, Mr. O'Connell has been harmed by Celonis' misrepresentations alleged herein in that Mr. O'Connell accepted the position with Celonis, leaving behind his lucrative and secure role at Salesforce, based on these misrepresentations. Mr. O'Connell worked for more than two years at Celonis operating under the false premise that he was continually vesting shares consistent with an initial grant of 3,000 RSUs.  Had he learned at any time before his termination that these representations were false, he never would have stayed at the Company.

75.    Mr. O'Connell's reliance on Celonis' misrepresentations was a substantial factor in causing his harm. He never would have accepted his employment offer if no (or only 300) RSUs were offered: it would not have been worthwhile for him to leave his secure position at Salesforce to do so.

76.    As a direct and consequential result of Celonis' actions, Mr. O'Connell has suffered extensive monetary harm, and emotional distress.

77.    In making the misrepresentations alleged herein, Celonis acted with malice, oppression, and/or fraud. As described herein, those at the highest level of Celonis, including co-CEO Bastian Nominacher, were aware that the company had failed to provide Mr. O'Connell

with documents referenced in his equity grant, and knew that such documents did not exist. Mr. O'Connell is therefore entitled to punitive damages under the California Civil Code.

## SECOND CAUSE OF ACTION
### FALSE PROMISE

78.     Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

79.     Celonis promised Mr. O'Connell, among others promises described herein, that it would grant Mr. O'Connell 3,000 RSUs following his execution of the Offer Letter.

80.     Celonis knew that this promise was falsely made, as it did not have the intention of performing its obligations in the Offer Letter. On information and belief, either the 2018 Stock Agreement referenced in Celonis' offer letter did not exist, or Celonis intentionally concealed it from Mr. O'Connell. Either way, Celonis had no intention to honor the grant of 3,000 RSUs in its Offer Letter to grant Mr. O'Connell 3,000 RSUs upon employment. According to the Company's later representations, it had not "executed" a 1-for-10 stock split prior to extending the Offer Letter to Mr. O'Connell.

81.     Despite Celonis' lack of intent to perform its obligations under the Offer Letter, Celonis accepted the benefits Mr. O'Connell conferred upon the Company through performing his job duties.

82.     Mr. O'Connell reasonably relied on Celonis' promises, taking Celonis' promise at face value – i.e., that he would receive 3,000 RSUs, pursuant to the plain terms of the Offer Letter. At the time Mr. O'Connell accepted Celonis' terms in the Offer Letter, Mr. O'Connell was ignorant of Celonis' secret intention not to perform. Mr. O'Connell could not, in the exercise of reasonable diligence, have discovered Celonis' secret intention. In reliance on Celonis' promises, Mr. O'Connell accepted a position in Celonis' sales department in which he delivered strong performance as described herein.

83.     Celonis did not perform the promised acts as alleged herein, including by failing to convey 3,000 RSUs to Mr. O'Connell upon the start of his employment.

84.     Mr. O'Connell has been harmed as alleged herein, including in that he did not receive 3,000 RSUs, which would have become 60,000 RSUs following a 20:1 split in Celonis' share price. Instead, Celonis falsely claims that Mr. O'Connell was entitled to only 300 RSUs upon hire, which became 6,000 RSUs after the 20:1 stock split.

85.     Additionally, Mr. O'Connell has been harmed by Celonis' misrepresentations alleged herein in that Mr. O'Connell accepted the position with Celonis, leaving behind his lucrative and secure role at Salesforce, based on this representation. Mr. O'Connell worked for more than two years at Celonis operating under the false premise that he was continually vesting shares consistent with an initial grant of 3,000 RSUs.  Had he learned at any time before his termination that these representations were false, he never would have stayed at the Company.

86.     Mr. O'Connell's reliance on Celonis' promises was a substantial factor in causing his harm. He never would have accepted his employment offer if no (or only 300) RSUs were offered: it would not have been worthwhile for him to leave his secure position at Salesforce to do so.

87.     As a direct and consequential result of Celonis' actions, Mr. O'Connell has suffered emotional distress.

88.     In making the false promises alleged herein, Celonis acted with malice, oppression, and/or fraud. As described herein, those at the highest level of Celonis, including co-CEO Bastian Nominacher, were aware that the company had failed to provide Mr. O'Connell with documents referenced in his equity grant, and knew that such documents did not exist. Mr. O'Connell is therefore entitled to punitive damages under the California Civil Code.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

89.     Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

90.     Celonis made various representations to Mr. O'Connell as alleged herein, including without limitation that:

a.  It was administering a legitimate, approved employee stock plan, referred to by Celonis as the "Celonis 2018 Restricted Stock Unit Plan";

b.  There was an underlying legitimate and finalized stock agreement, the terms of which governed the "Celonis 2018 Restricted Stock Unit Plan"; according to Celonis, this document was entitled "standard form of Restricted Stock Unit Agreement" or "applicable RSU agreement";

c.  The 1-for-10 forward stock split referenced in the footnote of Mr. O'Connell's Offer Letter had already happened, or was close to being completed, at the time he accepted Celonis' offer of employment;

d.  Celonis would grant Mr. O'Connell 3,000 RSUs upon his acceptance of the Offer;

e.  Celonis, as a legitimate stock plan administrator, would respond to reasonable requests for information and documents; and

f.  Mr. O'Connell and other employees would earn significant income through Celonis' stock value increases, if they continued their employment at the Company.

91.  Each of these representations was false.

92.  Celonis had no reasonable grounds for believing these representations were true when they were made. The Company, *inter alia*, (a) never responded to Mr. O'Connell's reasonable requests for information about his equity; (b) never provided any underlying stock documents referenced in the Offer Letter at Mr. O'Connell's request; (c) has repeatedly changed its position on the nature of his vested or unvested shares (and the attendant triggering events required for that vesting), and whether the Offer Letter did, or did not, grant Mr. O'Connell shares; and (d) had not "executed" a 1-for-10 stock split prior to extending the Offer Letter to Mr. O'Connell.

93.  On information and belief, either the 2018 Stock Agreement referenced in Celonis' offer letter does not exist, or Celonis is intentionally concealing it from Mr. O'Connell. Either way, Celonis had no intention to honor the grant of 3,000 RSUs in its Offer Letter to grant Mr. O'Connell 3,000 RSUs upon employment.

94.     Mr. O'Connell reasonably relied on Celonis' representation that he would receive 3,000 RSUs upon hire. Mr. O'Connell had no reason to doubt (a) that Celonis was administering a legitimate, lawful, and compliant employee stock plan, (b) that Celonis was offering 3,000 RSUs in good faith, or (c) that the "currently executed" stock split referenced in the Offer Letter had already occurred.

95.     Mr. O'Connell has been harmed as alleged herein, including in that he did not receive 3,000 RSUs, which would have become 60,000 RSUs following a 20:1 split in Celonis' share price. Instead, Celonis falsely claims that Mr. O'Connell was entitled to only 300 RSUs upon hire, which became 6,000 RSUs after the 20:1 stock split.

96.     Additionally, Mr. O'Connell has been harmed by Celonis' misrepresentations alleged herein in that Mr. O'Connell accepted the position with Celonis, leaving behind his lucrative and secure role at Salesforce, based on this representation. Mr. O'Connell worked for more than two years at Celonis operating under the false premise that he was continually vesting shares consistent with an initial grant of 3,000 RSUs.  Had he learned at any time before his termination that these representations were false, he never would have stayed at the Company.

97.     Mr. O'Connell's reliance on Celonis' representation was a substantial factor in causing his harm. He never would have accepted his employment offer if no (or only 300) RSUs were offered: it would not have been worthwhile for him to leave his secure position at Salesforce to do so.

98.     As a direct and consequential result of Celonis' actions, Mr. O'Connell has suffered emotional distress.

**FOURTH CAUSE OF ACTION**
**DECLARATORY RELIEF**

99.     Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

100.     An actual controversy exists between Mr. O'Connell and Celonis in that, among other things alleged herein, Celonis has violated and continues to violate the terms of the Offer

Letter because the Company has failed to convey to Mr. O'Connell RSUs consistent with a grant of 3,000 RSUs upon his hiring.

101.   Because a controversy exists among the parties, a declaration of the rights and responsibilities of the parties with respect to the correct interpretation of the terms of the Offer Letter is necessary.

102.   Mr. O'Connell seeks a declaration from this Court that Celonis was obligated to convey 3,000 RSUs to Mr. O'Connell upon the start of his employment with the Company.

**FIFTH CAUSE OF ACTION**
**BREACH OF CONTRACT**

103.   Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

104.   On October 26, 2018, Mr. O'Connell signed an Offer Letter Celonis presented to him.

105.   The Offer Letter provides, among other things, that: "Subject to the approval of Celonis' Board, you will be granted 3,000 restricted stock units (RSUs), each representing the right to receive one ordinary share of Celonis." **Ex. 1** ¶ 4.

106.   Mr. O'Connell performed all of the material requirements that the Offer Letter imposed on him and all conditions precedent to Celonis' obligation to grant Mr. O'Connell 3,000 RSUs, including providing continuous service to Celonis from his start date in November 2018, until Celonis wrongfully terminated him as set forth herein, on or around June 18, 2021.

107.   While the Offer Letter purports to condition Mr. O'Connell's grant of RSUs on "the terms and conditions" of the "Restricted Stock Unit Agreement" referenced in the Offer Letter; a "service-based requirement" subject to a one-year cliff teed off Mr. O'Connell's start date of December 3, 2018; and "a requirement that the Company complete either an initial public offering or a sale event prior to expiration of the RSUs, as described in more detail in the

applicable RSU agreement."[6]  However, Celonis agreed orally and in writing that Mr. O'Connell had vested over half of his RSUs. (See Section V.E).

108.    Celonis breached its obligation in paragraph 4 of the Offer Letter, by failing to grant Mr. O'Connell 3,000 RSUs per the terms of that provision.

109.    The conditions set forth above have either been met or are waived and/or excused.

110.    The document(s) purportedly incorporated by reference in this Agreement were intentionally withheld by Celonis, despite Mr. O'Connell's frequent requests. For over two years, Celonis refused to provide Mr. O'Connell with information regarding his equity position, or describing the purported liquidity event "requirement," or the terms governing expiration of his shares.

111.    Similarly, even if Celonis claimed a liquidity event was required before Mr. O'Connell's shares fully vested, this would not change the number or amount of total unvested shares it offered him in the Offer Letter (3,000), it would only affect the extent to which he was able to sell them.

112.    And Celonis nonetheless breached its contract with Mr. O'Connell, by refusing to permit him to take full advantage of the Tender Offer made available to all other employees, because it only permitted him to sell 506 of his shares, only if he executed a complete release of claims, despite the fact that he had far more than that to sell based on Celonis' promises.

113.    As of June 9, 2021, Celonis took the position that the Company granted Mr. O'Connell only 300 RSUs after he started with the company.

114.    Mr. O'Connell was harmed by Celonis' breach. Mr. O'Connell accepted the position with Celonis, leaving behind his lucrative and secure role at Salesforce, based on Celonis' promise that he would receive 3,000 RSUs. Mr. O'Connell worked for more than two years at Celonis operating under the false premise that he was continually vesting shares consistent with an initial grant of 3,000 RSUs.

---

[6] While Celonis has (nearly three years after entering into the Offer Letter agreement with Mr. O'Connell) claimed that the "currently executed 1-for-10 forward stock split" was a condition precedent to the issuance of his shares, Mr. O'Connell disputes Celonis' proffered definition of the term "currently executed." Among other reasons, Celonis falsely represented that this purported condition either had or would soon occur.

115.     Mr. O'Connell never would have accepted Celonis' offer of employment, had Celonis been transparent about its view that it was only granting him 300 shares to begin work there.

116.     And Celonis' ongoing representations to Mr. O'Connell and other employees that their ongoing employment would culminate in enormous value through realized gains of their equity kept Mr. O'Connell in his position for over two years.

117.     Celonis' breach was a substantial factor in causing Mr. O'Connell's harm. Mr. O'Connell never would have accepted his employment offer if no (or only 300) RSUs were offered: it would not have been worthwhile for him to leave his secure position at Salesforce to do so.

## SIXTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL

118.     Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

119.     Celonis promised Mr. O'Connell that it would grant him 3,000 RSUs through oral and written representations as alleged herein, including but not limited to, in his Offer Letter.

120.     Mr. O'Connell reasonably relied on Celonis' representation that he would receive 3,000 RSUs upon hire. Mr. O'Connell had no reason to doubt (a) that Celonis was offering 3,000 RSUs in good faith, or (b) that the "currently executed" stock split referenced in the Offer Letter had already occurred.

121.     Mr. O'Connell's reliance was foreseeable to Celonis because Celonis' promise of 3,000 RSUs significantly raised the value of Celonis' offer to Mr. O'Connell.

122.     Mr. O'Connell was harmed by Celonis' representation that he would receive 3,000 RSUs upon hire in that: (a) Celonis has not conveyed RSUs to Mr. O'Connell consistent with an initial grant of 3,000 RSUs; and (b) Mr. O'Connell accepted the position with Celonis, leaving behind his lucrative and secure role at Salesforce based on this representation; Mr. O'Connell worked for more than two years at Celonis operating under the false premise that he was continually vesting shares consistent with an initial grant of 3,000 RSUs.

**SEVENTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF FEHA**
**CAL. GOV. CODE § 12940 *ET SEQ.***

123.    Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

124.    California law prohibits any employer from discharging or otherwise discriminating against any person because he has opposed any practices forbidden under California's Fair Employment and Housing Act ("FEHA"). *See* Gov. Code Section 12940(h).

125.    Mr. O'Connell engaged in protected activity by providing truthful testimony in a sexual assault investigation, including through following:

    a.    On April 8, 2021, Mr. O'Connell was interviewed in connection with an investigation into alleged Company misconduct. He did not provide statements favorable to Celonis' defense in a sexual harassment case involving an individual, X, who reported to Mr. O'Connell at Celonis.

    b.    On June 4, 2021, the Company gave Mr. O'Connell a second chance to demonstrate his support for Celonis when its legal director Ron Katcher solicited documentation that would corroborate the Company's position. Again, Mr. O'Connell did not provide statements or evidence that would be favorable to Celonis.

126.    Approximately eleven days later, Celonis began its efforts to force him out of the Company.

127.    Celonis terminated Mr. O'Connell, causing him to lose salary, commissions, equity, and benefits, among other compensation.

128.    Mr. O'Connell's truthful testimony was a substantial motivating factor in Celonis putting him on a Performance Improvement Plan and pressuring him to resign, then terminating him; Mr. O'Connell was among the only remaining employees with personal knowledge of facts relevant to X's case, X's performance at Celonis, and X's credibility generally.

129.    Celonis sought to oust Mr. O'Connell for not toeing the Company line, or otherwise force him into a non-disclosure agreement for the risk he presented of giving

unfavorable testimony related to X in the future.

**EIGHTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF CAL. LAB. CODE § 1102.5**

130.    Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

131.    California Labor Code section 1102.5 makes it unlawful for an employer to retaliate against an employee for disclosing conduct that he reasonably believes is a violation of the law and/or for his refusal to participate in such conduct.

132.    At all relevant times, Celonis was Mr. O'Connell's employer, and Mr. O'Connell was Celonis' employee as those terms are defined under the Labor Code.

133.    Mr. O'Connell repeatedly made clear his opposition to conduct by Celonis he reasonably believed to be unlawful, and in which he refused to participate. By way of example only and as more fully set forth herein:

    a.    Beginning in late 2020, Mr. O'Connell reasonably believed the Company was engaged in SEC violations by artificially inflating the value of its stock and/or company to investors, prospective investors and the public at large, as described in more detail above. Repeatedly during his employment, Mr. O'Connell reported his belief that Celonis' conduct violated various securities laws requiring truthful disclosures to potential investors, thereby engaging in protected activity. He shared his views multiple times with his supervisor Chris Bernhoft, among others.

    b.    Mr. O'Connell reasonably believed Celonis' requests of him concerning X's case in April and June 2021 were unlawful attempts to cover up the Company's civil or criminal liability. Mr. O'Connell refused to participate in mounting Celonis' defense and alleged misconduct, instead providing truthful testimony in connection with the investigation.

    c.    Mr. O'Connell reasonably believed Celonis' failure to grant him the RSUs explicitly promised in his Offer Letter constituted a violation of SEC

regulations or otherwise constituted fraud. Mr. O'Connell reported his belief to Celonis HR personnel that Celonis' misrepresentations were unlawful.

    d.    Mr. O'Connell reasonably believed Celonis was misrepresenting the nature of his (and potentially other employees') equity in the Company, in violation of the California Labor Code among other laws. Mr. O'Connell reported Celonis' misrepresentations to his supervisor Chris Bernhoft.

134.    Celonis terminated Mr. O'Connell. Celonis' termination of Mr. O'Connell was motivated by his refusal to participate, his reporting, or the risk that he would report the conduct described above, which Mr. O'Connell reasonably believed to be unlawful. In close temporal proximity to his reporting and/or his refusal to become complicit in what he perceived to be the Company's unlawful conduct, Mr. O'Connell was terminated.

135.    Mr. O'Connell was harmed, *inter alia*, in that due to his termination he lost salary, commissions, equity, and benefits, among other compensation.

## NINTH CAUSE OF ACTION

### VIOLATION OF THE UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*

136.    Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

137.    Celonis is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

138.    Celonis engaged in unfair, unlawful, and fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

139.    Celonis engaged in "unlawful" business practices by violating multiple laws, including the statutory and common law violations alleged herein.

140.    In addition to the statutory and common law violations alleged above, Celonis violated California Government Code section 12964.5, which makes it an unlawful employment practice for an employer, in exchange for a raise or bonus to require an employee to sign a release of a claim or right under this part.

141.    Celonis violated Government Code section 12964.5 when, as described herein, the Company conditioned Mr. O'Connell's participation in a Company-wide tender offer (i.e., an offer given to all other Celonis employees) on his releasing his claims to all the additional stock Mr. O'Connell was entitled to pursuant to the terms of the Offer Letter. Specifically, to accept the benefit of the tender offer, Celonis required Mr. O'Connell to "relinquish[] any claim you may have against the Company or its affiliates in relation to the Surrendered RSUs."

142.    Similarly, restricted stock is akin to wages under the law, and "An employer shall not require the execution of a release of a claim or right on account of wages due, or to become due, or made as an advance on wages to be earned, unless payment of those wages has been made. . . . Violation of this section by the employer is a misdemeanor." (Lab. C. § 206.5(a))

143.    Celonis sought to force Mr. O'Connell to release claims against the Company for the stock he was rightfully owed, just for the opportunity to participate in a Company-wide tender offer being made to all other employees. Such conduct is unlawful under state employment laws.

144.    Celonis engaged in fraudulent and/or unfair business practices as alleged herein, including without limitation:

  a. Celonis falsely represented it was administering a legitimate, approved employee stock plan, referred to by Celonis as the "Celonis 2018 Restricted Stock Unit Plan";

  b. Celonis falsely represented there was an underlying legitimate and finalized stock agreement, the terms of which governed the "Celonis 2018 Restricted Stock Unit Plan"; according to Celonis, this document was entitled "standard form of Restricted Stock Unit Agreement" or "applicable RSU agreement";

  c. Celonis falsely represented the 1-for-10 forward stock split referenced in the footnote of Mr. O'Connell's Offer Letter had already happened, or was close to being completed, at the time he accepted Celonis' offer of employment;

d.    Celonis falsely represented the Company would grant Mr. O'Connell 3,000 RSUs upon his acceptance of the Offer;

e.    Celonis falsely represented that Celonis, as a legitimate stock plan administrator, would respond to reasonable requests for information and documents;

f.    Celonis falsely represented that Mr. O'Connell and other employees would earn significant income through Celonis' stock value increases, if they continued their employment at the Company;

g.    Celonis never responded to Mr. O'Connell's reasonable requests for information about his equity;

h.    Celonis never provided any underlying stock documents referenced in the Offer Letter at Mr. O'Connell's request;

i.    Celonis has repeatedly changed its position on the nature of his vested or unvested shares (and the attendant triggering events required for that vesting), and whether the Offer Letter did, or did not, grant Mr. O'Connell shares;

j.    Celonis required Mr. O'Connell to choose either to be placed on a PIP or terminated with a full release of claims against Celonis and non-disclosure agreement in exchange for his severance package;

k.    Celonis required Mr. O'Connell to execute a complete release of his claims against the Company in exchange for the sale of a portion of his shares back to the Company in connection with Celonis' 2021 tender offer;

l.    Celonis retaliated against Mr. O'Connell for providing truthful testimony in connection with a sexual harassment case against the Company, as described herein;

m.    Celonis retaliated against Mr. O'Connell for requesting the compensation the Company had promised him; and

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

n.      Celonis retaliated against Mr. O'Connell for reporting and opposing its violations of federal securities laws, as described herein.

145.    Mr. O'Connell reserves the right to allege other unlawful, unfair, and/or fraudulent business practices in which Celonis engaged.

146.    Celonis' representations and omissions were material because they were likely to deceive, and did deceive, Mr. O'Connell as alleged herein.

147.    Mr. O'Connell has suffered harm in that, *inter alia*:

a.      Celonis failed to convey 3,000 RSUs consistent with terms of the Offer Letter;

b.      Mr. O'Connell left his secure and lucrative position with Salesforce to join Celonis as described herein; and

c.      Celonis terminated Mr. O'Connell for unlawfully motivated reasons causing him to lose salary, commissions, equity, and benefits, among other compensation.

148.    Mr. O'Connell seeks restitution and/or injunctive relief to redress the injuries caused by Celonis' violations.

## TENTH CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

149.    Mr. O'Connell incorporates by reference each and every allegation in this complaint as though fully set forth herein.

150.    At all relevant times, Celonis was Mr. O'Connell's employer, and Mr. O'Connell was Celonis' employee as those terms are defined under the Labor Code.

151.    Celonis discharged Mr. O'Connell on July 26, 2021.

152.    The following were substantial motivating reasons for Mr. O'Connell's discharge: (a) Mr. O'Connell reasonably believed Celonis' requests of him concerning the X case were an attempt at covering up potential civil or criminal liability held by the Company, and refused to participate in the cover up; (b) Mr. O'Connell reasonably believed and reported that the Company was engaged in SEC violations by artificially inflating the value of its stock and/or company to investors, prospective investors and the public at large; (c) Mr. O'Connell reasonably believed

1  that Celonis' failure to grant him the RSUs explicitly promised in his Offer Letter constituted a

2  further violation of SEC regulations or were otherwise fraudulent; (d) Mr. O'Connell reasonably

3  believed and reported that the Company was misrepresenting the nature of his (and potentially

4  other employees') equity in the Company, in violation of the California Labor Code among other

5  laws; and (e) Mr. O'Connell requested the compensation the Company had promised him.

6       153.    Mr. O'Connell was harmed by his discharge from Celonis, as he has lost salary,

7  commissions, equity, and benefits, among other compensation.

8       154.    The discharge was a substantial factor in causing Mr. O'Connell's harm; because

9  of the discharge, Mr. O'Connell lost salary, commissions, equity, benefits, and other

10  compensation through his job with Celonis.

11  **VII.   PRAYER FOR RELIEF**

12       WHEREFORE, Plaintiffs prays for judgment against Defendants as follows:

13       1.    For economic and non-economic damages according to proof;

14       2.    For a constructive trust conveying equity in Celonis to Mr. O'Connell according to

15             proof;

16       3.    For garden variety emotional distress damages;

17       4.    For restitution;

18       5.    For punitive damages, as provided for by California Civil Code Section 3294;

19       6.    For appropriate injunctive and declaratory relief;

20       7.    For an award of prejudgment and post-judgment interest;

21       8.    For costs of suit herein;

22       9.    For an award of reasonable attorneys' fees, as provided for by California

23             Government Code Sections 12940 *et seq.*, California Labor Code Section 1102.5;

24             15 U.S.C.§ 78u-6(h)(1)(C), and any other applicable provision;

25       10.   For any other relief the Court deems just and proper.

26  /././

27  /././

28  /././

1

## VIII.   JURY DEMAND

2

      Plaintiff demand trial by jury on all issues so triable.

3

Dated:   March 14, 2022

**COTCHETT, PITRE & McCARTHY, LLP**

4

5

By:  _____

      TAMARAH P. PREVOST

6

      KEVIN J. BOUTIN

7

Dated:   March 14, 2022

**THE ARNS LAW FIRM**

8

9

By:   _/s/ Robert S. Arns_

      ROBERT S. ARNS

10

      KATHERINE A. RABAGO

11

      *Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

COMPLAINT

32

# Exhibit 1

# CELONIS, INC.

1820 Avenue M Unit #544
Brooklyn, NY 11230

October 26, 2018

Shawn O'Connell
via DocuSign

Dear Shawn,

Celonis, Inc. (the "Company"), a wholly-owned subsidiary of Celonis SE ("Celonis"), is pleased to offer you employment on the following terms:

1.      **Position**.  Your initial title will be "Regional Director, High-Tech" in the department "Sales North America West", and you will initially report to Chris Bernhoft, VP Sales West, North America. This is a full-time position.  While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company.  By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

2.      **Cash Compensation**.

(a)      **Base Salary**.  The Company will pay you a starting salary at the rate of U.S.\$200,000 per year, payable in accordance with the Company's standard payroll schedule. This salary will be subject to adjustment pursuant to the Company's employee compensation policies in effect from time to time.

(b)      **Commission Plan**.  You will be eligible to participate in the Company's Commission Plan (the "Plan") pursuant to which you may earn commissions based upon achievement of certain goals set forth in your Individual Commission Plan (as defined in the Plan). Your Individual Compensation Plan will be established and approved annually by either Co-Chief Executive Officer of the Company (or, at such time as the Company has only a single Chief Executive Officer, such officer). The Company reserves the right to amend your Individual Commission Plan at any time. Your annual target commissions will be U.S. \$200,000. To the extent earned, commissions will be paid to you quarterly, by the 30th day after the end of the quarter to which the payments relate, provided that the Company reserves the right to delay payments in accordance with the Plan if such delay is necessary to determine revenue recognition matters. Following the start of your employment, the Company will provide you with the Plan and your Individual Compensation Plan, which you will be required to review and sign in order to begin earning commissions.

Notwithstanding the Plan, U.S.\$70,000 of your commission payments will be paid as a recoverable draw over your first 6 month of employment in equal installments (i.e. U.S.\$11,666.67 per month) in accordance with the Company's standard payroll schedule, subject to your continued employment through each payment date, and your future commission

payments (if any) earned will be reduced (not below U.S. $0) by U.S. $70,000 to recover this draw.

3.     **Employee Benefits**.  As a regular employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits, as in effect from time to time. In addition, you will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

4.     **RSUs.** Subject to the approval of Celonis' Board, you will be granted 3,000[1] restricted stock units (RSUs), each representing the right to receive one ordinary share of Celonis. The RSUs shall be subject to the terms and conditions set forth in the Celonis 2018 Restricted Stock Unit Plan and the standard form of Restricted Stock Unit Agreement thereunder. The RSUs will be subject to two vesting conditions, both of which must be satisfied in order for the RSUs to vest: (1) a requirement that you provide service to the Company over approximately four years (the "service-based requirement"), and (2) a requirement that the Company complete either an initial public offering or a sale event prior to expiration of the RSUs, as described in more detail in the applicable RSU agreement. Satisfaction of the service-based requirement will be subject to a "cliff" which, subject to your continuous service, will be satisfied on the first company-wide quarterly vesting date occurring 12 months after your start date. Subject to your continuous service, the service-based requirement will be satisfied with respect to an additional 6.25% of the RSUs on each quarterly vesting date thereafter.

5.     **Proprietary Information and Inventions Agreement**.  Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Proprietary Information and Inventions Agreement, a copy of which is attached hereto as **Exhibit A**.

6.     **Employment Relationship**.  Employment with the Company is for no specific period of time.  Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause.  Any contrary representations that may have been made to you are superseded by this letter agreement.  This is the full and complete agreement between you and the Company on this term.  Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

7.     **Tax Matters**.

(a)     **Withholding**.  All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

(b)     **Tax Advice**.  You are encouraged to obtain your own tax advice regarding your compensation from the Company.  You agree that the Company does not have a duty to

---

[1] The number of RSUs specified assumes the completion of the currently executed 1-for-10 forward stock split before the RSUs are granted.

design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company or its Board of Directors related to tax liabilities arising from your compensation.

        8.      **Interpretation, Amendment and Enforcement**.  This letter agreement and Exhibit A supersede and replace any prior agreements, representations or understandings (whether written, oral, implied or otherwise) between you and the Company and constitute the complete agreement between you and the Company regarding the subject matter set forth herein.  This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company.  The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by New York law, excluding laws relating to conflicts or choice of law.  You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in New York in connection with any Dispute or any claim related to any Dispute.

* * * * *

We hope that you will accept our offer to join the Company.  You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter agreement and the enclosed Proprietary Information and Inventions Agreement and returning them to me.  This offer, if not accepted, will expire at the close of business on October 30, 2018.  As required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States.  Your employment is also contingent upon your starting work with the Company on December 3, 2018.

If you have any questions, please do not hesitate to contact us.

Very truly yours,

CELONIS, INC.

By: _____ *Bastian Nominacher*

Name: _____ Bastian Nominacher

Title: _____ CFO

I have read and accept this employment offer:

_____
Signature of Employee

Dated: _____ 10/26/2018 | 07:29 PDT

**Attachment**

Exhibit A:  Proprietary Information and Inventions Agreement

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Tamarah P. Prevost (SBN 313422)  COTCHETT, PITRE & McCARTHY, LLP<br>840 Malcolm Road, Suite 200, Burlingame, CA  94010<br><br>TELEPHONE NO.: 650-697-6000    FAX NO. *(Optional):* 650-697-0577<br>E-MAIL ADDRESS: tprevost@cpmlegal.com<br>ATTORNEY FOR *(Name):* Plaintiff Shawn O'Connell | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**03/14/2022**<br>**Clerk of the Court**<br>BY: KAREN VALDES<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA  94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: CGC-22-598686 |
|---|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09)<br>[ ] Insurance coverage (18) | [ ] Mass tort (40)<br>[ ] Securities litigation (28) |
| [ ] Asbestos (04)<br>[ ] Product liability (24) | [ ] Other contract (37)<br>**Real Property** | [ ] Environmental/Toxic tort (30)<br>[ ] Insurance coverage claims arising from the |
| [ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse<br>condemnation (14) | above listed provisionally complex case<br>types (41) |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [x] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is  [x] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel      e. [ ] Coordination with related actions pending in one or more
          issues that will be time-consuming to resolve              courts in other counties, states, or countries, or in a federal
   c. [ ] Substantial amount of documentary evidence               court
                                                       f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify):* 14
5. This case [ ] is  [x] is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: March 14, 2022
Tamarah P. Prevost
_____               ▶  _____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev.September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
  domain, landlord/tenant, or
  foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**    **AUG 17, 2022**

**TIME:**    **10:30 am**

**PLACE:**    **Department 610**
           **400 McAllister Street**
           **San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

---

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order   **without an appearance**   at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

---

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

 (SEE LOCAL RULE 4)

---

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

**CM-110**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | *FOR COURT USE ONLY* |

TELEPHONE NO.:        FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| | CASE NUMBER: |
|---|---|
| **CASE MANAGEMENT STATEMENT** | |
| *(Check one):* ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000)    ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:      Time:      Dept.:      Div.:      Room:

Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by** *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint    *(Describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

**Page 1 of 5**
Cal. Rules of Court,
rules 3.720–3.730
*www.courts.ca.gov*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.   Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐   *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial. ☐ a nonjury trial.   *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐  The trial has been set for *(date):*
b.  ☐  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐  days *(specify number):*
b.  ☐  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:                                           f.  Fax number:
e.  E-mail address:                                              g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**
a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.
(1)  For parties represented by counsel: Counsel ☐ has ☐ has not  provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.
(2)  For self-represented parties: Party ☐ has ☐ has not  reviewed the ADR information package identified in rule 3.221.

b.  **Referral to judicial arbitration or civil action mediation** (if available).
(1)  ☐  This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.
(2)  ☐  Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
(3)  ☐  This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110 [Rev. July 1, 2011]                    **CASE MANAGEMENT STATEMENT**                    **Page 3 of 5**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**
   a. ☐ Insurance carrier, if any, for party filing this statement *(name):*
   b. Reservation of rights: ☐ Yes ☐ No
   c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**
Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.
   ☐ Bankruptcy ☐ Other *(specify):*
Status:

**13. Related cases, consolidation, and coordination**
   a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 13a.
   b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**
   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**
   ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

   c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20.** Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

## Experienced mediators are available in the following areas

Business
Civil Rights
Commercial
Construction
Contracts
Disability
Discrimination
Education
Employment/Workplace
Environmental
Family
Family-Certified Specialists
Fee Disputes
Financial
Government
Insurance
Intellectual Property
Intra-Organizational
Labor
Landlord/Tenant
Land Use
LGBT Issues
Malpractice: Legal-Medical-Professional
Partnership Dissolutions
Personal Injury
Probate/Trust
Products Liability
Real Estate
Securities
Taxation
Uninsured Motorist
And more…

## TESTIMONIALS

"This was the third attempt to mediate this case, and the BASF mediator was far and away the best mediator. I dare say that we would not have settled today but for his efforts."

*George Yuhas, Esq.*
*Orrick, Herrington & Sutcliffe LLP*

"We had an excellent experience and, after 8 1/2 hours of mediation, [the BASF mediator] settled a very difficult case involving claims against four clients of ours by a wealthy investor who claimed inadequate disclosure was made."

*Robert Charles Friese, Esq.*
*Shartsis Friese LLP*

"When the other side made their offer, I thought there was no way we would reach an agreement – we were too far apart, but the mediator brought us together. He saved me a lot of time and aggravation by facilitating a settlement. Thanks!"

*Leslie Caplan*
*Global Warming Campaign Manager*
*Bluewater Network*

"BASF staff was very helpful – stayed on the task and kept after a hard to reach party. The mediator was great!"

*Mark Abelson, Esq.*
*Campagnoli, Abelson & Campagnoli*

"The [BASF] mediator was excellent! He was effective with some strong, forceful personalities."

*Denise A. Leadbetter, Esq.*
*Zacks, Utrecht & Leadbetter*



**FOR OUTSTANDING ADR SERVICES**
Voted into the **Hall of Fame** In The Recorder's 'Best of' Poll
5 YEARS IN A ROW 2010 – 2014

# MEDIATION SERVICES



PROCEDURES, PODCASTS, FORMS, MEDIATOR BIOGRAPHIES AND PHOTOGRAPHS:
**www.sfbar.org/mediation**

adr@sfbar.org or
415-982-1600



THE BAR ASSOCIATION OF
SAN FRANCISCO

### WHAT IS BASF'S MEDIATION SERVICE?

The Bar Association of San Francisco's Mediation Services is a private mediation service which will assist you with almost any type of dispute, from simple contract disputes to complex commercial matters.

### WHO ARE THE MEDIATORS?

They are established mediators who have private mediation practices and have met our extensive experience requirements. By going through BASF you receive the services of these highly qualified mediators at a great value.

### HOW DO I LEARN MORE ABOUT THE MEDIATORS?

BASF's website at www.sfbar.org/mediation provides bios, photos and hourly rates of mediators. You can search by name or by area of law needed for your case. BASF staff is always available to assist you with selection or to answer questions.

### HOW MUCH DOES THE SERVICE COST?

A $295 per party administrative fee is paid to BASF at the time the Consent to Mediate form is filed. This fee covers the first hour of mediator preparation time and the first two hours of session time. Time beyond that is paid at the mediator's normal hourly rate.

### HOW IS THE MEDIATOR CHOSEN?

You may request a specific mediator from our website (www.sfbar.org/mediation) and indicate your choice on the BASF Consent to Mediate form, or you may indicate on the form that you would like BASF staff to assist with the selection.

### WHY SHOULD I GO THROUGH BASF? CAN'T I JUST CALL THE MEDIATOR DIRECTLY?

BASF mediators have agreed to provide three free hours as a service to BASF. If you go directly to one of our mediators, you do not qualify for the free hours unless you notify us. Once you have filed with us, you will talk directly to the mediator to ask questions and to set a convenient mediation date and time.

### HOW LONG IS THE MEDIATION SESSION?

The time spent in mediation will vary depending on your dispute. BASF mediators are dedicated to reaching a settlement, whether you need a few hours or several days.

### WHO CAN USE THE SERVICE?

BASF mediation can be utilized by anyone and is NOT limited to San Francisco residents or issues. Also, the service may be used before a court action is filed or at any time during a court action.

### OUR CASE IS FILED IN COURT. HOW DO WE USE BASF'S MEDIATION SERVICES?

When you file the San Francisco Superior Court's Stipulation to ADR form, check the box indicating "Mediation Services of BASF." Then complete BASF's Consent to Mediate form found on our website and file it with us. (If the matter was filed in a different county, please check with that court for the appropriate process.)

### WE ARE ON A DEADLINE; HOW QUICKLY CAN WE MEDIATE?

Once all parties have filed all the paperwork, BASF can normally have you in touch with the mediator within a day or two. If there is a deadline, BASF staff will give the matter top priority.

### WHAT TYPES OF DISPUTES CAN I MEDIATE?

BASF mediators are trained in 30+ areas of law. If you don't see the area you need on our website or in this brochure, contact us; it is very likely we can match your need with one of our panelists.

### MORE INFORMATION

Visit our website (www.sfbar.org/mediation) where you can search by name or by area of law. For personal assistance, please call 415-982-1600.

WWW.SFBAR.ORG/MEDIATION • ADR@SFBAR.ORG • 415.982.1600

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name  and address)* | *FOR COURT USE ONLY* |

TELEPHONE NO.:

ATTORNEY FOR *(Name):*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| | |
|---|---|
| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER:<br><br>**DEPARTMENT 610** |

**1)   The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐   **Early Settlement Program of the Bar Association of San Francisco (BASF) -** Pre-screened experienced attorneys provide a minimum of 2 hours of settlement conference time for a BASF administrative fee of $295 per party.  Waivers are available to those who qualify.  BASF handles notification to all parties, conflict checks with the panelists, and full case management.  www.sfbar.org/esp

☐   **Mediation Services of BASF -** Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate.  Waivers of the administrative fee are available to those who qualify.  BASF assists parties with mediator selection, conflicts checks and full case management.  www.sfbar.org/mediation

☐   **Private Mediation -** Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐   **Judicial Arbitration -** Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought.  The court appoints a pre-screened arbitrator who will issue an award.  There is no fee for this program.  www.sfsuperiorcourt.org

☐   **Judicial Mediation -** The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program.  www.sfsuperiorcourt.org

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days     ☐ 90-120 days     ☐ Other (please specify) _____

☐   **Other ADR process (describe)** _____

**2)   The parties agree that the ADR Process shall be completed by (date):** _____

**3)   Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

| | |
|---|---|
| _____ <br> Name of Party Stipulating | _____ <br> Name of Party Stipulating |
| _____ <br> Name of Party or Attorney Executing Stipulation | _____ <br> Name of Party or Attorney Executing Stipulation |
| _____ <br> Signature of Party or Attorney | _____ <br> Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | ☐ Plaintiff ☐ Defendant ☐ Cross-defendant |
| Dated: _____ | Dated: _____ |

☐   *Additional signature(s) attached*



**Superior Court of California, County of San Francisco**
**Alternative Dispute Resolution**
**Program Information Package**



> The plaintiff must serve a copy of the ADR information package
> on each defendant along with the complaint.  (CRC 3.221(c))

## WHAT IS ADR?
Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial.  There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences.  In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to court.

## WHY CHOOSE ADR?
"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:
- **ADR can save time.**  A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.**  The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.**  For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

## HOW DO I PARTICIPATE IN ADR?
Litigants may elect to participate in ADR at any point in a case.  General civil cases may voluntarily enter into the court's ADR programs by any of the following means:
- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet) at the clerk's office located at 400 McAllister Street, Room 103;
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-782-8905 or www.sfbar.org/adr for more information.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA   94102
415-551-3869

***Or, visit the court ADR website at www.sfsuperiorcourt.org***

The San Francisco Superior Court offers different types of ADR processes for general civil matters; each ADR program is described in the subsections below:

## 1) SETTLEMENT CONFERENCES

The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute early in the litigation process.

**(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP):** ESP remains as one of the Court's ADR programs (see Local Rule 4.3) but parties must select the program – the Court no longer will order parties into ESP.

**Operation:** Panels of pre-screened attorneys (one plaintiff, one defense counsel) each with at least 10 years' trial experience provide a minimum of two hours of settlement conference time, including evaluation of strengths and weakness of a case and potential case value. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist. BASF handles notification to all parties, conflict checks with the panelists, and full case management. The success rate for the program is 78% and the satisfaction rate is 97%. Full procedures are at: www.sfbar.org/esp.

**Cost:** BASF charges an administrative fee of $295 per party with a cap of $590 for parties represented by the same counsel. Waivers are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see enclosed brochure.

**(B) MANDATORY SETTLEMENT CONFERENCES:** Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO,** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

**Operation:** Experienced professional mediators, screened and approved, provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process. BASF staff handles conflict checks and full case management. Mediators work with parties to arrive at a mutually agreeable solution. The success rate for the program is 64% and the satisfaction rate is 99%.

**Cost:** BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the administrative fee are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

**(B) JUDICIAL MEDIATION** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at anytime throughout the litigation process.

**Operation:** Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge for the Judicial Mediation program.

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may elect any private mediator of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

## 3) ARBITRATION

An arbitrator is neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION:** When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

**Operation:** Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF TO ENROLL IN THE LISTED BASF PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF.



# Superior Court of California
## County of San Francisco



**HON. JOHN K. STEWART**
PRESIDING JUDGE

# Judicial Mediation Program

**JENIFFER B. ALCANTARA**
ADR ADMINISTRATOR

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

| | |
|---|---|
| The Honorable Michael I. Begert | The Honorable Harold E. Kahn |
| The Honorable Suzanne R. Bolanos | The Honorable Curtis E.A. Karnow |
| The Honorable Angela Bradstreet | The Honorable Charlene P. Kiesselbach |
| The Honorable Andrew Y.S. Cheng | The Honorable James Robertson, II |
| The Honorable Samuel K. Feng | The Honorable Richard B. Ulmer, Jr. |
| The Honorable Charles F. Haines | The Honorable Mary E. Wiss |

Parties interested in Judicial Mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program and deliver a courtesy copy to Department 610. A preference for a specific judge may be indicated on the request, and although not guaranteed, every effort will be made to fulfill the parties' choice. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court's Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3869

03/2015 (ja)

## EJT-001-INFO   Expedited Jury Trial Information Sheet

This information sheet is for anyone involved in a civil lawsuit who will be taking part in an **expedited jury trial**—a trial that is shorter and has a smaller jury than a traditional jury trial.

> You can find the law and rules governing expedited jury trials in Code of Civil Procedure sections 630.01–630.29 and in rules 3.1545–3.1553 of the California Rules of Court. You can find these at any county law library or online. The statutes are online at *http://leginfo.legislature.ca.gov/faces/codes.xhtml.* The rules are at *www.courts.ca.gov/rules.*

**(1)   What is an expedited jury trial?**

An expedited jury trial is a short trial, generally lasting only one or two days. It is intended to be quicker and less expensive than a traditional jury trial.

As in a traditional jury trial, a jury will hear your case and will reach a decision about whether one side has to pay money to the other side. An expedited jury trial differs from a regular jury trial in several important ways:

- **The trial will be shorter.** Each side has 5 hours to pick a jury, put on all its witnesses, show the jury its evidence, and argue its case.
- **The jury will be smaller.** There will be 8 jurors instead of 12.
- **Choosing the jury will be faster.** The parties will exercise fewer challenges.

**(2)   What cases have expedited jury trials?**

- **Mandatory expedited jury trials.** All limited civil cases—cases where the demand for damages or the value of property at issue is $25,000 or less—come within the *mandatory expedited jury trial* procedures. These can be found in the Code of Civil Procedure, starting at section 630.20. Unless your case is an unlawful detainer (eviction) action, or meets one of the exceptions set out in the statute, it will be within the expedited jury trial procedures. These exceptions are explained more in **(7)** below.
  - **Voluntary expedited jury trials.** If your civil case is not a limited civil case, or even if it is, you can choose to take part in a *voluntary expedited jury trial*, if all the parties agree to do so. Voluntary expedited jury trials have the same shorter time frame and smaller jury that the

mandatory ones do, but have one other important aspect—**all parties must waive their rights to appeal.** In order to help keep down the costs of litigation, there are no appeals following a *voluntary* expedited jury trial except in very limited circumstances. These are explained more fully in **(9)**.

**(3)   Will the case be in front of a judge?**

The trial will take place at a courthouse and a judge, or, if you agree, a temporary judge (a court commissioner or an experienced attorney that the court appoints to act as a judge) will handle the trial.

**(4)   Does the jury have to reach a unanimous decision?**

No. Just as in a traditional civil jury trial, only three-quarters of the jury must agree in order to reach a decision in an expedited jury trial. With 8 people on the jury, that means that at least 6 of the jurors must agree on the verdict in an expedited jury trial.

**(5)   Is the decision of the jury binding on the parties?**

Generally, yes, but not always. A verdict from a jury in an expedited jury trial is like a verdict in a traditional jury trial. The court will enter a judgment based on the verdict, the jury's decision that one or more defendants will pay money to the plaintiff or that the plaintiff gets no money at all.

But parties in an expedited jury trial, like in other kinds of trials, are allowed to make an agreement before the trial that guarantees that the defendant will pay a certain amount to the plaintiff even if the jury decides on a lower payment or no payment. That agreement may also put a cap on the highest amount that a defendant has to pay, even if the jury decides on a higher amount. These agreements are known as "high/low agreements." You should discuss with your attorney whether you should enter into such an agreement in your case and how it will affect you.

**(6)   How else is an expedited jury trial different?**

The goal of the expedited jury trial process is to have shorter and less expensive trials.

- The cases that come within the mandatory expedited jury trial procedures are all limited civil actions, and they must proceed under the limited discovery and

Judicial Council of California, *www.courts.ca.gov*
Revised July 1, 2016, Mandatory Form
Code of Civil Procedure, § 630.01–630.10
Cal. Rules of Court, rules 3.1545–3.1553

**Expedited Jury Trial Information Sheet**

EJT-001-INFO, Page 1 of 2



## EJT-001-INFO     Expedited Jury Trial Information Sheet

pretrial rules that apply to those actions. See Code of Civil Procedure sections 90–100.

- The voluntary expedited jury trial rules set up some special procedures to help those cases have shorter and less expensive trials. For example, the rules require that several weeks before the trial takes place, the parties show each other all exhibits and tell each other what witnesses will be at the trial. In addition, the judge will meet with the attorneys before the trial to work out some things in advance.

The other big difference is that the parties in either kind of expedited jury trial can make agreements about how the case will be tried so that it can be tried quickly and effectively. These agreements may include what rules will apply to the case, how many witnesses can testify for each side, what kind of evidence may be used, and what facts the parties already agree to and so do not need the jury to decide. The parties can agree to modify many of the rules that apply to trials generally or to any pretrial aspect of the expedited jury trials.

(7) **Do I have to have an expedited jury trial if my case is for $25,000 or less?**

Not always.  There are some exceptions.

- The mandatory expedited jury trial procedures do not apply to any unlawful detainer or eviction case.
- Any party may ask to opt out of the procedures if the case meets any of the criteria set out in Code of Civil Procedure section 630.20(b), all of which are also described in item 2 of the *Request to Opt Out of Mandatory Expedited Jury Trial* (form EJT-003). Any request to opt out must be made on that form, and it must be made within a certain time period, as set out in Cal. Rules of Court, rule 3.1546(c). Any opposition must be filed within 15 days after the request has been served.

*The remainder of this information sheet applies only to voluntary expedited jury trials.*

(8) **Who can take part in a voluntary expedited jury trial?**

The process can be used in any civil case that the parties agree may be tried in one or two days. To have a voluntary expedited jury trial, both sides must want one. Each side must agree to all the rules described in (1), and to waive most appeal rights. The agreements between the parties must be put into writing in a

document called *[Proposed] Consent Order for Voluntary Expedited Jury Trial*, which will be submitted to the court for approval. (Form EJT-020 may be used for this.) The court must issue the consent order as proposed by the parties unless the court finds good cause why the action should not proceed through the expedited jury trial process.

(9) **Why do I give up most of my rights to an appeal in a voluntary expedited jury trial?**

To keep costs down and provide a faster end to the case, all parties who agree to take part in a voluntary expedited jury trial must agree to waive the right to appeal the jury verdict or decisions by the judicial officer concerning the trial unless one of the following happens:

- Misconduct of the judicial officer that materially affected substantial rights of a party;
- Misconduct of the jury; or
- Corruption or fraud or some other bad act that prevented a fair trial.

In addition, parties may not ask the judge to set the jury verdict aside, except on those same grounds. Neither you nor the other side will be able to ask for a new trial on the grounds that the jury verdict was too high or too low, that legal mistakes were made before or during the trial, or that new evidence was found later.

(10) **Can I change my mind after agreeing to a voluntary expedited jury trial?**

No, unless the other side or the court agrees. Once you and the other side have agreed to take part in a voluntary expedited jury trial, that agreement is binding on both sides. It can be changed only if **both** sides want to change it or stop the process or if a court decides there are good reasons the voluntary expedited jury trial should not be used in the case. This is why it is important to talk to your attorney **before** agreeing to a voluntary expedited jury trial. This information sheet does not cover everything you may need to know about voluntary expedited jury trials. It only gives you an overview of the process and how it may affect your rights. **You should discuss all the points covered here and any questions you have about expedited jury trials with an attorney before agreeing to a voluntary expedited jury trial.**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Tamarah P. Prevost (SBN 313422)  COTCHETT, PITRE & McCARTHY, LLP<br>840 Malcolm Road, Suite 200, Burlingame, CA  94010<br><br>TELEPHONE NO.: 650-697-6000     FAX NO. *(Optional):* 650-697-0577<br>E-MAIL ADDRESS: tprevost@cpmlegal.com<br>ATTORNEY FOR *(Name):* Plaintiff Shawn O'Connell | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**03/14/2022**<br>**Clerk of the Court**<br>BY: KAREN VALDES<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA  94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:  CGC-22-598686 |
|---|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [x] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [x] is not     complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify):* 14
5. This case [ ] is  [x] is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: March 14, 2022
Tamarah P. Prevost
_____          ▶ _____
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. September 1, 2021] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**  CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

POS-01

| ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NO: 313422 | FOR COURT USE ONLY |
|---|---|
| NAME: Tamarah Prevost | |
| FIRM NAME: Cotchett, Pitre & McCarthy, LLP | |
| STREET ADDRESS: 840 Malcolm Road, Suite 200 | |
| CITY: Burligame          STATE: CA     ZIP CODE: 94010 | |
| TELEPHONE NO.: 650-697-6000     FAX NO.: 650-697-0577 | |
| E-MAIL ADDRESS: tprevost@cpmlegal.com | |
| ATTORNEY FOR (Name): Plaintiff Shawn O'Connell | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco |
|---|
| STREET ADDRESS: 400 McAllister Street |
| MAILING ADDRESS: 400 McAllister Street |
| CITY AND ZIP CODE: San Francisco 94102 |
| BRANCH NAME: Civic Center Courthouse |

| Plaintiff/Petitioner: Shawn O'Connell |
|---|
| Defendant/Respondent: Celonis, Inc., a Delaware Corporation et al. |

| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>CGC-22-598686 |
|---|---|

TO *(insert name of party being served):* Celonis, Inc., a Delaware Corporation et al.

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:   March 21, 2022

Tamarah Prevost
(TYPE OR PRINT NAME)                                    ▶           (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*

1. [x] A copy of the summons and of the complaint.
2. [x] Other *(specify):*
   Civil Case Cover; Notice to Plaintiff; ADR Information Package; Mediation Services Brouchure; Blank Stipulation to ADR; Blank Case Managment Statement.

*(To be completed by recipient):*

Date this form is signed: April 11, 2022

Marley Ann Brumme, for Celonis, Inc.
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶           (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Counsel
Skadden, Arps

Page 1 of

| Form Adopted for Mandatory Use<br>Judicial Council of California | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Code of Civil Procedur<br>§§ 415.30, 417.1 |
|---|---|---|