UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHAWN O'CONNELL,

Plaintiff,

v.

CELONIS, INC.,

Defendant.

Case No. 22-cv-02320-WHO

**ORDER DENYING MOTION TO TRANSFER OR COMPEL AND DENYING MOTION TO DISMISS**

Re: Dkt. Nos. 21, 22

Defendant Celonis, Inc. ("Celonis") moves to transfer venue of this employment action to the Southern District of New York, or, in the alternative, to compel arbitration against plaintiff Shawn O'Connell. It alleges that I should enforce the forum selection clause in O'Connell's offer letter from Celonis selecting the federal and state courts of New York as the jurisdiction for any disputes and, in the alternative, seeks enforcement of an agreement to arbitrate that O'Connell allegedly agreed to by using the website of a third-party (TriNet) that Celonis shared human resources and benefits-related employer responsibilities with. Because the forum selection clause violates Section 925 of the California Labor Code and the Section 1404 factors weigh against transfer, the motion to transfer venue is DENIED. Further, Celonis does not show by a preponderance of evidence that TriNet was empowered by Celonis to bind Celonis employees to an arbitration agreement or that O'Connell had actual or inquiry notice of the existence of the arbitration agreement contained in the TriNet Terms and Conditions. Therefore, the motion to compel arbitration is also DENIED.

Separately Celonis moves to dismiss O'Connell's claims related to his employment, compensation, and alleged wrongful termination by Celonis. As explained below, I conclude that California law applies to O'Connell's claims and DENY the motion to dismiss.

## BACKGROUND

Celonis is a software company that was incorporated in Munich, Germany, and has headquarters in New York. Complaint ("Compl.") [Dkt. No. 1-1], ¶ 16. On October 26, 2018, it presented O'Connell, a California citizen (*id.*, ¶ 14) with a written offer letter ("Offer Letter")

United States District Court
Northern District of California

setting forth terms of employment with Celonis.  *See* Compl., Ex. 1 [Dkt. No.1] at 1-4.  The Offer Letter explained:

> Subject to the approval of Celonis' Board, you will be granted 3,000[fn1] restricted stock units (RSUs), each representing the right to receive one ordinary share of Celonis.  The RSUs shall be subject to the terms and conditions set forth in the Celonis 2018 Restricted Stock Unit Plan and the standard form of Restricted Stock Unit Agreement thereunder.

*Id*. at 2.  Footnote 1 of the Offer Letter stated: "The number of RSUs specified assumes the completion of the currently executed 1-for-10 forward stock split before the RSUs are granted."  *Id*.  O'Connell alleges that because Celonis was unable to match his former salary, Celonis offered him "a significant equity grant of 3,000 restricted stock units"  then-valued at $70 each after multiple verbal and written negotiations regarding the proposed terms of his compensation at Celonis with representatives of Celonis and recruiters.  Compl. ¶¶ 1, 21-23.

O'Connell's Offer Letter also provided:

> The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by New York law, excluding laws relating to conflicts or choice of law. You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in New York in connection with any Dispute or any claim related to any Dispute.

Offer Letter at 3.

O'Connell accepted and signed the Offer Letter on October 26, 2018.  *Id*.  at 4.  He lived and worked for Celonis in the San Francisco Bay Area from 2018 until July 26, 2021.  Declaration of Shawn O'Connell ("O'Connell Decl.") [Dkt. No. 26] ¶ 2.  According to his declaration, most of his coworkers and his supervisor resided in California, and he performed most of his work in California.  O'Connell Decl. ¶ 5.

O'Connell alleges that during his employment with Celonis, he repeatedly requested documentation of his "equity position," but Celonis never provided that information.  Compl. ¶ 27.  He alleges that in June 2021, after attempting to clarify his equity position at Celonis, Celonis took the position that the Offer Letter had granted him only 300 shares upon his hiring, based on the

footnote explaining the "currently executed" 1-for-10 split.  *Id.* ¶¶ 3, 32, 34-36.  He also alleges that the Celonis 2018 Restricted Stock Unit Plan did not exist at the time of his hire and may not have existed at the time of his termination.  *Id.* ¶ 4.

O'Connell alleges that on January 28, 2020, Celonis actually completed a 1-for-20 stock split instead of a 1-for-10 split.  *Id.* ¶ 36.  After the stock split, Celonis calculated that O'Connell owned 6,000 RSUs (300 x 20), but O'Connell believed he had 60,000 RSUs based on the Offer Letter and his prior interactions with the recruiters (3,000 x 20).  *Id.* ¶¶ 23, 36-37.

In June 2021, Celonis presented O'Connell with two options: he could either choose to be placed on a 30-day Performance Improvement Plan ("PIP") or accept termination.  *Id.* ¶¶ 53, 56.  O'Connell did not accept either of the two options, and he was terminated on July 26, 2021.  *Id.* ¶ 66.

The two parties dispute the reason for O'Connell's termination.  In its motion to transfer venue, Celonis argues that it offered to place O'Connell on the PIP because "[his] performance was lagging" and it wanted to "give him a chance to improve."  Motion to Transfer Venue ("Tran. Mot.") [Dkt. No. 21] at 2.  But according to O'Connell and accepted as true for purposes of the pending motions, his termination was a result of the disagreement over his compensation, his refusal to testify in favor of Celonis in a sexual assault investigation at the company (Compl. ¶¶ 43-46), and his knowledge of and reporting to his supervisors at Celonis "what he reasonably believed were serious securities violations in connection with its potential IPO and other stock offerings."  *Id.* ¶¶ 47-50.

The two parties also disagree on whether O'Connell signed or agreed to an arbitration agreement governing his claims during his employment.  According to Celonis's counsel, the company had a contract with TriNet Group, Inc. ("TriNet") that allowed TriNet to share certain human resources and benefits-related employer responsibilities with Celonis as co-employers.  *See* Declaration of Marley Ann Brumme ("Brumme Decl.") [Dkt. No. 29-1] Ex. A at 2.  Celonis argues that on December 4, 2018, O'Connell logged on to the TriNet platform.  Celonis's Reply in Further Support of its Motion to Transfer ("Tran. Reply") [Dkt. No. 29] at 5.  Celonis also argues that when he logged on to the site on that date, O'Connell was "presented with the TriNet Terms

and Conditions Agreement" (the "TriNet TCA") and O'Connell allegedly agreed to them when he "click[ed] and accept[ed]" the TriNet TCA. *Id.* However, Celonis provides no declarations to support these allegations and arguments from any person with knowledge at Celonis or TriNet Instead, its attorneys make assertions in the brief and then attach the TriNet TCA to their declarations. *See* Declaration of Lance Etcheverry ("Etcheverry Decl.") [Dkt. No. 21-2], Ex. A; Brumme Decl., Ex. A.

The TriNet TCA provided by counsel is an eight-page-long document with a subsection titled "Dispute Resolution Protocol" ("DRP"). TriNet TCA at 5-8. The TCA attached to the attorney declarations does not specifically reference Celonis or any particular employee. *See generally id.* Under the DRP, all disputes "arising out of or relating to" the employee's employment with TriNet or with "[his] company" would be arbitrated. *Id.* at 6. The DRP provides that: "[a]rbitration begins by bringing a claim under the applicable employment arbitration rules and procedures of the Judicial Arbitration and Mediation Services, Inc ('JAMS') . . . [t]he specific provisions of this DRP and the applicable rules of JAMS . . . will direct the arbitrator in decisions regarding conducting the arbitration." *Id.* at 7.

The last subsection of the TCA is titled "Acknowledgement" and states:

> By acknowledging below, I confirm that I have read and understand the contents of this TCA (including, but not limited to, the DRP), that I have the responsibility to read and familiarize myself with the employee handbook and additional policies for my company and that I agree to abide by the terms and conditions set forth above in this TCA, including but not limited to the DRP, as well as the policies and procedures set forth in the employee handbook and additional policies.

*Id.* at 8. But the TCA provided to the Court does not contain a signature line, a signature, or any other type of written or electronic acknowledgment. *See generally id.*

Celonis argues that when O'Connell accessed the TriNet site on December 4, 2018, he was forced to affirmatively click and accept the TriNet TCA. According to Celonis, at that point TriNet would have sent a confirmatory email to O'Connell containing the TriNet TCA. *See* Tran. Reply at 5. In Reply, Celonis points to a "confirmation email" that was sent to "s.oconnell@celonis.de." *Id.* at 4. That emails states: "[w]e are sending this email to provide

4

1    notification regarding two important matters: (1) your acceptance of the TriNet Terms &

2    Conditions Agreement (TCA), and (2) your COBRA rights and responsibilities . . . TCA: This

3    confirms that you have accepted the TCA, which you clicked through on the TriNet platform on

4    12/04/2018."

5      In a Sur-reply, O'Connell denies having seen that or any similar email.  *See* O'Connell

6    Decl. ¶ 6; *see also* Declaration of Shawn O'Connell in Support of Plaintiff's Sur-Reply ("Sur-

7    reply Decl.") [Dkt. No. 37] ¶ 4.  He states that he recalls being given and using the email address

8    "s.oconnell@celonis.com," but does not "ever recall accessing the email address account

9    's.oconnell@celonis.de' nor using this email address for work purposes."  Sur-Reply Decl. ¶¶ 3-4.

10   He also states that before filing this action, "I requested through my counsel a copy of my

11   personnel file 'including any agreements to which [I am] purportedly bound' [and] Celonis

12   produced several documents to me, none of which contained the agreement attached" as the

13   TriNet TCA.  *Id.* ¶ 5.

14     On March 14, 2022, O'Connell filed a complaint against Celonis in the Superior Court of

15   the State of California in and for the County of San Francisco.  Dkt. No. 1.  He pleads ten causes

16   of actions related to the Offer, his relationship with Celonis, and his termination.  *See* Compl. ¶¶

17   67-154 (asserting claims for: intentional misrepresentation; false promise; negligent

18   misrepresentation; declaratory relief; breach of contract; promissory estoppel; retaliation in

19   violation of California's Fair Employment and Housing Act ("FEHA"); retaliation in violation of

20   California Labor Code; violation of California's Unfair Competition law ("UCL"); and wrongful

21   termination in violation of public policy).

22     Celonis removed the case to this Court based on diversity jurisdiction.  *See* Notice of

23   Removal [Dkt. No. 1].  On May 9, 2022, Celonis filed two motions.  In its first motion, Celonis

24   seeks to transfer venue to the Southern District of New York, or, in the alternative, to compel

25   arbitration ("motion to transfer venue").  *See* Tran. Mot.  It contends that I should enforce the

26   forum selection clause in the Offer Letter or grant the transfer to the Southern District of New

27   York pursuant to 28 U.S.C. § 1404(a).  Tran. Mot. at 2-3.  It asks, in the alternative, to compel

28   arbitration pursuant to the TriNet TCA.

United States District Court
Northern District of California

1    Celonis also filed a motion to dismiss, arguing that I should enforce the choice of law

2    clause in the Offer Letter and apply New York law to assess O'Connell's claims.  Under New

3    York law, Celonis further contends that all of O'Connell's claims should be dismissed based on

4    the terms of the Offer Letter and his failure to state a claim for retaliation or wrongful termination.

5    O'Connell opposes both motions.

6    **LEGAL STANDARD**

7    **I.    MOTION TO TRANSFER**

8    The general federal venue statute provides "[a] civil action may be brought in—(1) a

9    judicial district in which any defendant resides, if all defendants are residents of the State in which

10    the district is located; (2) a judicial district in which a substantial part of the events or omissions

11    giving rise to the claim occurred, or a substantial part of property that is the subject of the action is

12    situated; or (3) if there is no district in which an action may otherwise be brought as provided in

13    this section, any judicial district in which any defendant is subject to the court's personal

14    jurisdiction with respect to such action."  28 U.S.C. § 1391(b).

15    A party moving to transfer venue may do so under either 28 U.S.C. § 1404(a) or 28 U.S.C.

16    § 1406, depending on whether the initial venue is proper.  If the initial venue is proper, the moving

17    party seeks a discretionary transfer under Section 1404(a), which provides that a district court may

18    transfer the case to any other district in which the case could have been originally filed "[f]or the

19    convenience of parties and witnesses" or "in the interest of justice."  If the initial venue is

20    improper, the moving party seeks a mandatory transfer under Section 1406, which provides that a

21    district court "shall dismiss, or if it be in the interest of justice, transfer the case to any district or

22    division in which it could have been brought."

23    Under Section 1404(a), courts generally balance a number of factors, including,

24    (1) plaintiff's choice of forum, (2) convenience of the parties, (3)
     convenience of the witnesses, (4) ease of access to the evidence, (5)

25    familiarity of each forum with the applicable law, (6) feasibility of
     consolidation of other claims, (7) any local interest in the controversy, and

26    (8) the relative court congestion and time of trial in each forum.

27

28

1  *Martinez v. BMW of N. Am., LLC*, No. 3:19-CV-05479-WHO, 2019 WL 6727837, at *2 (N.D.

2  Cal. Dec. 11, 2019) (quoting *Barnes & Noble v. LSI Corp.*, 823 F. Supp. 2d 980, 993 (N.D. Cal.

3  2011)); *see also Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000); *Decker Coal*

4  *Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). "The party moving for

5  transfer of a case bears the burden of demonstrating transfer is appropriate." *Saunders v. USAA*

6  *Life Ins. Co.*, 71 F. Supp. 3d 1058, 1060 (N.D. Cal. 2014). The decision to transfer venue under §

7  1404 is a matter within the sound discretion of the district court. *See King v. Russell,* 963 F.2d

8  1301, 1304 (9th Cir. 1992). The Ninth Circuit held that California's public policy is also a

9  significant factor. *See Jones*, 211 F.3d at 499 ("We also conclude that the relevant public policy

10 of the forum state, if any, is at least significant a factor in the § 1404(a) balancing."). The party

11 moving for transfer of a case bears the burden of demonstrating transfer is appropriate. *See*

12 *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir.1979), opinion

13 modified, 828 F.2d 1445 (9th Cir.1987).

14 **II.    MOTION TO COMPEL ARBITRATION**

15      The Federal Arbitration Act ("FAA") governs the motion to compel arbitration. 9 U.S.C.

16 §§ 1 et seq. Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate

17 exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v.*

18 *Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of

19 an arbitration agreement, federal courts should apply ordinary state-law principles that govern the

20 formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003)

21 (internal quotation marks and citation omitted). If the court is satisfied "that the making of the

22 arbitration agreement or the failure to comply with the agreement is not in issue, the court shall

23 make an order directing the parties to proceed to arbitration in accordance with the terms of the

24 agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be

25 resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S.

26 1, 24-25 (1983).

27 **III.   MOTION TO DISMISS**

28      Under Federal Rule of Procedure 12(b)(6), a district court must dismiss a complaint if it

United States District Court
Northern District of California

fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570.  In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  The court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

### I.    MOTION TO TRANSFER

The Offer Letter contains a forum selection clause designating New York federal and state courts as the forum for any disputes arising from the Offer Letter or O'Connell's relationship with Celonis.  Celonis argues that the forum selection clause applies to O'Connell's claims and requires transfer of this case to New York.  *See* Tran. Mot. at 6.  O'Connell responds that the forum selection clause violates the California Labor Code and that the § 1404 factors weigh against transfer.  *See* Oppo. at 3-6, 7-10.  I conclude that the forum selection clause is unenforceable and DENY the motion to transfer.

### A.    The Forum Selection Clause Is Voidable Under California Labor Law

The Supreme Court has held that "§ 1404(a) . . . provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013).  Specifically, it has instructed that "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Id.* at 62.  Therefore, the presence of a forum

1     selection clause changes the traditional analysis when considering a § 1404 motion, and a court

2     should enforce the forum selection clause unless there are "extraordinary circumstances unrelated

3     to the convenience of the parties." *Id.*

4          However, as the Ninth Circuit recently explained, Section 925 of the California Labor

5     Code, "which grants employees the option to void a forum-selection clause under a limited set of

6     circumstances, determines the threshold question of whether [a] contract contains a valid forum-

7     selection clause." *DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp*., 28 F.4th 956, 964

8     (9th Cir. 2022); *see also Ruff v. Wilson Logistics, Inc.*, No. 22-CV-00988-WHO, 2022 WL

9     1400014, at *6 (N.D. Cal. May 12, 2022).  The key provisions of Section 925 are:

> (a) An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:
>      (1) Require the employee to adjudicate outside of California a claim arising in California.
>      (2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.
> (b) Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.
> (e) This section shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be adjudicated or the choice of law to be applied.
> (f) This section shall apply to a contract entered into, modified, or extended on or after January 1, 2017.

Cal. Lab. Code § 925.

          Celonis does not dispute that O'Connell primarily worked and resided in California, that

he was not represented by legal counsel when he negotiated the terms of the contract, and that he

entered into the contract after January 1, 2017.  The parties disagree on whether O'Connell was

required to agree to the forum selection clause as a condition of working for Celonis.  Celonis

argues that the forum selection clause cannot be considered a "condition of employment" because

O'Connell could have negotiated away the clause but he never attempted to do so.  *See* Tran. Mot.

at 8; Tran. Reply at 2.  Celonis admits that the expiration date on the Offer Letter and the relevant

language provided that the Offer Letter could not be "amended or modified," Ex. 1 at 3, but

United States District Court
Northern District of California

1    contends that language applies only to "this [O]ffer, not any potential offer."  Reply at 2.

2    According to Celonis, O'Connell could have and should have declined to sign this Offer Letter

3    and instead negotiated a new offer.  *See* Reply at 2.

4         Celonis relies on two Central District of California opinions to support its argument that

5    Section 925 does not apply here because O'Connell could have opted out of or negotiated away

6    the forum selection clause.  *See Cordero v. C.R. Eng., Inc.*, No. EDCV 20-2675 JGB (KKx), 2021

7    WL 2793929, at *2 (C.D. Cal. Apr. 30, 2021); *Romero v. Watkins & Shepard Trucking, Inc.*, No.

8    EDCV 19-2158 PSG (KKx), 2020 WL 5775180, at *3 (C.D. Cal. July 10, 2020).  But *Cordero*

9    and *Romero* are not helpful here.  The *Cordero* court held that a forum selection clause within a

10   contract was not a condition of employment because the contract contained explicit language

11   about the employee's right to opt out.  2021 WL 2793929, at *2.  Specifically, the contract read:

12   "[i.e., the mandatory forum selection clause] is *optional* and *not* a condition of employment.

13   Driver has the right to reject it without affecting Driver's eligibility for employment with C.R.

14   England."  *Id.* (internal quotation marks omitted) (emphasis in original).  Likewise, in *Romero*, the

15   court reached the same conclusion because the agreement "clearly delineated" that employees

16   could opt out.  2020 WL 5775180, at *3.  Celonis points to no similar language in the Offer Letter

17   it gave to O'Connell.  There is no language explaining that the forum selection clause is optional

18   or any language informing O'Connell that he could opt out of that or any other clause in the

19   Letter.

20        Celonis' argument, instead, rests on an expectation that O'Connell should have taken the

21   initiative and negotiated the term before signing the Offer, despite language in the Offer Letter

22   indicating it could not be modified or amended.  However, O'Connell's Offer Letter is similar to

23   the contracts in *DePuy* and *Ruff*, where the courts concluded that under Section 925, the forum

24   selection clauses were voidable and unenforceable.  In those cases, the forum selection clauses

25   were included in employment agreements, and the contracts did not contain any explicit

26   instructions identifying the forum selection clauses as "optional" clauses.  *See DePuy*, 28 F.4th at

27   959-60; *Ruff*, 2022 WL 1500014, at *1.  The courts ruled in both cases that the forum selection

28   clauses were voidable because they constituted a condition of employment.  *See* 28 F.4th at 964-

65; 2022 WL 1500014, at *6.

Given the express language of the Offer Letter and O'Connell's plausible allegations, I agree that O'Connell was required to agree to the contract containing the forum selection clause as a condition of his employment with Celonis.  Since the facts alleged satisfy all the requirements of Section 925, the forum selection clause is voidable and cannot be enforced over O'Connell's objection.

**B.   Transfer Is Not Warranted**

In the absence of a valid forum selection clause, Celonis has not met its burden demonstrating that § 1404 factors clearly favor transfer.

**1.   Private Interest Factors**

"Factors relating to the parties' private interests include relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Atl. Marine*, 571 U.S. at 63 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).  In addition, "great weight is generally accorded to a plaintiff's choice of forum, although that choice is given less weight when filed as a class action and where there are not significant contacts between the forum and the allegations of the complaint." *Lax v. Toyota Motor Corp.*, 65 F. Supp. 3d 772, 777 (N.D. Cal. 2014) (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)).  When evaluating this factor, a court must consider both the plaintiffs' and the defendants' contacts with the forum relating to the cause of action.  *Id.*  Here, the private interest factors favor O'Connell.

**Plaintiff's Choice of Forum**.  O'Connell is a California citizen.  Compl. ¶ 14.  He has lived in Danville, California for the past 18 years, and he chose to bring suit in San Francisco, California.  *See id.*  During his employment with Celonis, he lived and worked in the San Francisco Bay Area, and the majority of his work was performed in California.  *See* O'Connell Decl. ¶¶ 3, 5.

Despite these uncontested facts, Celonis argues that O'Connell's choice of forum should

be given less deference because the Celonis personnel O'Connell communicated with regarding the contested RSUs are not located in this District. *See* Tran. Mot. at 10-11. That does not outweigh O'Connell's choice of forum. O'Connell has established significant connections to this District and his choice is entitled to deference. *See Ennis v. Aetna Life Ins. Co.*, No. 18-CV-01617-WHO, 2018 WL 4636197, at *3 (N.D. Cal. Sept. 24, 2018); *Ruff*, 2022 WL 1500014, at *7.

**Convenience of the Parties and Witnesses**. These factors also weigh in favor of O'Connell. As discussed above, O'Connell is an individual residing in California. He avers that most of his coworkers who he worked with on a daily basis, including his supervisor, resided in California. O'Connell Decl. ¶ 5. O'Connell notes that while Celonis is a company founded in Munich, Germany (Compl. ¶ 16), it has significant contacts in this District because it has an office in San Francisco and its litigation counsel is located in Palo Alto. *See* O'Connell Decl. ¶ 4.

Celonis contends that most of the relevant witnesses – Celonis employees who have personal knowledge regarding the bases for O'Connell's claims, particularly those identified in O'Connell's Complaint – are located outside this District. Tran. Mot. at 11. Specifically, it contends that out of the seven employees identified in O'Connell's complaint, three of them are based in New York, two are based in Germany, one is based in Spain and New York, and one is based in Pennsylvania. Declaration of Alexandra Brunetti ("Brunetti Decl.") [Dkt. No. 21-2] at 2. But as a corporation, it can more easily dispatch them to California than can O'Connell to New York.[1] *See Ruff*, 2022 WL 1500014, at *6. As I noted in *Lax,* "[t]he convenience of a litigant's employee witnesses is entitled to little weight" when deciding a motion to transfer, because litigants are able to compel their employees to testify at trial, regardless of forum. 65 F. Supp. 3d at 779 (internal quotation marks omitted).

Taken together, the private interest factors tilt in favor of O'Connell.

### 2.      Public Interest Factors

"Public factors include the administrative difficulties flowing from court congestion; the

---

[1] Celonis's declarant, Alexandra Brunetti, does not identify which of the seven are former employees. Brunetti fails to demonstrate if any former employee, over whom Celonis may no longer have control, is based in New York.

local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Decker*, 805 F.2d at 843 (quoting *Piper Aircraft*, 454 U.S. at 241 n.6). The public factors also favor O'Connell.

California has a strong interest in having labor disputes arising in California adjudicated in California. That is confirmed by Section 925 itself, as that section expresses California's strong public policy that "prevents contractual circumvention of its labor law." *Karl v. Zimmer Biomet Holdings, Inc.*, No. C 18-04176 WHA, 2018 WL 5809428, at *7 (N.D. Cal. Nov. 6, 2018); *see also DePuy*, 28 F.4th at 958-62; *Ruff*, 2022 WL 1500014, at *8.

Celonis contends that this public interest is "insufficient" to constitute extraordinary circumstances by citing *Bromlow v. D & M Carriers, LLC*, 438 F. Supp. 3d 1021, 1031 (N.D. Cal. 2020). *See* Tran. Mot. at 10. A showing of "extraordinary circumstances" however is only necessary where there is an otherwise valid forum selection clause. *See Atl. Marine*, 571 U.S. at 59. In *Bromlow*, because the plaintiff did not show he worked primarily in California, the forum selection clause he agreed to was not voidable under Section 925. *Id*. at 1030. Therefore, the *Bromlow* court was required to consider whether "extraordinary circumstances" existed to escape application of the otherwise-valid forum selection clause. *Id*. at 1031. Here, the forum selection clause is voidable. O'Connell does not need to show "extraordinary circumstances" to defeat transfer.

Celonis also contends that although California has local interest in adjudicating this dispute, O'Connell's local citizenship alone is insufficient to weigh against transfer when "many of the relevant events occurred outside of this District" – specifically, the decision to terminate O'Connell was made at Celonis's New York headquarters, and the drafting of the Offer and the RSU plan occurred in New York and Germany. *See* Reply at 4. However, Celonis does not take into consideration that O'Connell is not only a California citizen but also was employed in California. During his employment, he primarily worked and resided in California. O'Connell Decl. ¶¶ 2-3. As discussed above, O'Connell's connections with California are substantial, but he

13

1    has little (if any) connection with New York.  The ten causes of action O'Connell pleads are

2    centered around his *employment* and his relationship with Celonis.  Therefore, California's strong

3    policy interest in protecting its local employees outweighs the interest of New York in

4    adjudicating this matter.

5            The other public interest factors are less significant and are insufficient to tip the balance in

6    Celonis's favor.  *See Ruff*, 2022 WL 1500014, at *8.  For one, both federal courts can apply

7    California law.  *See Atl. Marine*, 571 U.S. at 67 ("federal judges routinely apply the law of a State

8    other than the State in which they sit."); *Liberty Mut. Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d

9    385, 398 (S.D.N.Y. 2014) ("The forum's familiarity with the governing law is typically 'to be

10   accorded little weight on a motion to transfer venue because federal courts are deemed capable of

11   applying the substantive law of other states'" (citations omitted).).  And while Celonis points out

12   that there are more pending cases per judgeship in this District than in the Southern District of

13   New York, Tran. Mot. at 9, that does not mean that this Court is overly congested.  The difference

14   in the number of pending cases per judgeship is insubstantial compared to California's strong

15   public interest in enforcing its labor laws.

16           The balance of all § 1404 factors weighs against transfer.

17   **II.     MOTION TO COMPEL ARBITRATION**

18           "In determining whether a valid arbitration agreement exists, federal courts apply ordinary

19   state law." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (internal

20   quotation marks omitted); *Ingle*, 328 F.3d at 1170.  O'Connell was employed in California.

21   Therefore, I evaluate whether a valid agreement to arbitrate exists between the parties under

22   California law.  *See Ingle*, 328 F.3d at 1170.  And under California law, a valid contract requires

23   the "mutual consent of the parties," which is "generally achieved through the process of offer and

24   acceptance." *DeLeon v. Verizon Wireless*, LLC, 207 Cal. App. 4th 800, 813 (2012) (internal

25   citations omitted).  Whether there was mutual consent "is determined under an objective standard

26   applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of

27   their words and acts, and not their unexpressed intentions or understandings." *Id.*  Although

28   mutual consent is generally a question of fact whether a certain set of facts is sufficient to establish

United States District Court
Northern District of California

14

1   a contract is a question of law.  *Id.*; *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863

2   (2016).

3        Even if an offeree does not know all of the terms of an offer, he "may be held to have

4   accepted, by his conduct, whatever terms the offer contains" so long as there was a sufficient

5   "outward manifestation or expression of assent." *Windsor Mills, Inc. v. Collins & Aikman Corp.*,

6   25 Cal. App. 3d 987, 992 (1972).  But "when the offeree does not know that a proposal has been

7   made to him this objective standard does not apply.  Hence, an offeree, regardless of apparent

8   manifestation of his consent, is not bound by inconspicuous contractual provisions of which he

9   was unaware, contained in a document whose contractual nature is not obvious." *Id.* at 993

10  (citations omitted).  These principles apply to all contracts, including arbitration agreements.

11  *Nguyen*, 763 F.3d at 1175.

12       Celonis alleges in its brief that O'Connell "affirmatively accepted the TriNet T&Cs" that

13  contained an arbitration clause when O'Connell visited the TriNet website on December 4, 2018,

14  after O'Connell had accepted the Offer Letter.  Tran. Mot. at 12.  However, in support of its

15  motion, Celonis provides no evidence – from a person with knowledge at TriNet or Celonis – to

16  support any of its assertions.  Instead, it merely attached a copy of the TriNet TCA to its attorney's

17  declaration.  In Reply, Celonis further asserts – again without providing evidence from a person

18  know knowledge – that when O'Connell "logged onto the TriNet platform [he] was presented with

19  the TriNet T&Cs, which include the DRP." Reply at 5.  The brief asserts that, "[a]fter clicking

20  and accepting the TriNet T&Cs, an email was sent to O'Connell's Celonis email address—the

21  address connected with his TriNet platform account—that acknowledged O'Connell's acceptance

22  of the TriNet T&Cs and provided him with a PDF copy of them." *Id.*  The declaration provided

23  by Celonis' outside counsel merely attaches a "true and correct copy" of an "December 4, 2018

24  email to Shawn O'Connell" at "s.oconnell@celonis.de" attaching the TriNet TCA.  Supp.

25  Brumme Decl. [Dkt. No. 29-1], ¶ 2.

26       Celonis has failed to meet it burden to show by a *preponderance of evidence* that

27  O'Connell agreed to be bound by the TriNet TCA, including the DRP.  *Norcia v. Samsung*

28  *Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (under California law, the

United States District Court
Northern District of California

15

party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.").  It provided no evidence from anyone with personal knowledge that supports its assertions that TriNet and Celonis had an agreement as co-employers at the relevant time or that the TriNet TCAs provided to the court by litigation counsel were the TriNet TCAs accessible to and/or provided to new Celonis employees during the relevant time period.  There was no evidence from TriNet or Celonis explaining how the TriNet TCAs were provided to O'Connell at an email address he regularly used.

With respect to the email provided belatedly in reply by litigation counsel, O'Connell asserts that he never saw that email, does not recall using a .de email address, and never saw or received the TriNet TCAs.  Sur-Reply Decl. ¶¶ 3-4.  At oral argument, counsel for Celonis made a proffer – which I accept as true for purposes of ruling on these motions – that when an employee joins Celonis the employee is assigned two emails (one .com and one .de), that it was O'Connell who accessed the TriNet site on December 4, 2018 because he affirmatively submitted personal information (including his home address in California) through the TriNet site on that date, and that O'Connell's signature block from early in his tenure at Celonis included a .de email extension.  Accepting these proffers as true does not change the outcome here.

For a web-based contract to be valid, the website must either place the user on actual notice of the agreement or "put[] a reasonably prudent user on inquiry notice of the terms of the contract."  *Nguyen*, 763 F.3d at 1177; *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017).  How websites appear to users, how prominent a notice is that by using the site the user is agreeing to Terms and Conditions, and whether the Terms and Conditions are obviously accessible to the user before they agree to use the site, are critical pieces of information necessary to support the formation of a web-based contract.  *See Nguyen*, 763 F.3d at 1177 (whether a website reasonably communicated the existence of the terms is a fact-intensive inquiry that "depends on the design and content of the website and the agreement's webpage.").  When a party like Celonis asserts that an employee agreed to a web-based arbitration agreement, evidence regarding what the employee saw and how assent to agreements was manifested is key information.  *See, e.g.*, *Jurado v. Schutz*, 655 LLC, 2017 WL 600076, at *5-6 (C.D. Cal. Feb. 13,

16

1   2017) (discussing evidence from TriNet's Vice President for Technology Operations about what

2   the plaintiff would have seen when accessing its site and attaching screen shots showing the "I

3   accept" and "Reject" buttons).

4          The question here is not whether the arbitration agreement was sufficiently conspicuous

5   within the TriNet TCA, but what O'Connell would have seen when he logged onto the TriNet site

6   in December 2018 (*e.g*., was there a prominent hyperlink that puts users on notice of need to

7   review attached TCAs?) and whether and how a user was expected to manifest affirmative assent

8   to the TCAs (*e.g*., use of a "clickbox" demonstrating assent or text of a warning that by proceeding

9   to use the TriNet site, agreement to hyperlinked TCAs would be manifested).  That evidence is

10  wholly lacking.  Celonis does not provide images of the TriNet site as it appeared in December

11  2018 or other evidence showing the design and content of the TriNet pages, how the TCAs were

12  disclosed to users, or how users manifested assent to the TCAs.  Instead, Celonis's litigation

13  counsel provides a copy of the TriNet TCA that supposedly went to O'Connell's .de email address

14  *after* he accessed the TriNet site.  *See* Reply at 5.  As noted, O'Connell denies having seen or

15  signed this document before.  O'Connell Decl. ¶ 6.

16         This alleged confirmation email – even if properly authenticated by someone with personal

17  knowledge – cannot on its own satisfy Celonis' burden.  I cannot find that O'Connell has been put

18  on inquiry notice simply based on the alleged confirmation email.  *See Snow v. Eventbrite*, No. 20-

19  CV-03698-WHO, 2020 WL 6135990, at *10 (N.D. Cal. Oct. 19, 2020).  Celonis has not provided

20  – or even offered to provide – the relevant evidence necessary to evaluate the design and content

21  of the TriNet sign-in pages to determine whether O'Connell was put on sufficient notice of the

22  DRP contained within the TriNet TCAs.

23         Celonis attempts to analogize to *Kutluca v. PQ N.Y., Inc.*, 266 F. Supp. 3d 691 (S.D.N.Y.

24  2017), arguing that O'Connell's perhaps faulty belief that he did not receive an email attaching the

25  TCAs or use the .de email address cannot render the DRP non-binding.  *See* Reply at 6.  *Kutluca* is

26  fundamentally different from the present case.  There, the defendants provided "numerous and

27  extensive" evidentiary submissions making it clear that plaintiff "clicked 'I Accept to the terms of

28  the TCA and DRP." *Id*. at 701.

United States District Court
Northern District of California

17

Here, Celonis has not shown by a preponderance of the evidence that O'Connell assented to the DRP within the TriNet TCAs.  It brought this motion to compel and was charged with making an adequate evidentiary showing, acting with adequate diligence.  *See, e.g., Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 859 (9th Cir. 2022) (affirming district court's denial of a motion to compel, as well as denial of motion for reconsideration, where defendant could have provided additional evidence in support of motion to compel but failed to do so).  Even when the deficient evidentiary showing was identified during the hearing, the evidence Celonis proffered – which is accepted as true – does not satisfy its burden. Celonis does not get multiple bites at the apple to attempt to prove an agreement to arbitrate binds O'Connell.  *See Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) ("the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules" and a "court may not devise novel [procedural] rules to favor arbitration over litigation.").  Particularly considering that Celonis has also moved to dismiss O'Connell's complaint, addressed below, efficiencies and Celonis' choices mandate denial of the motion to compel.

## III.     MOTION TO DISMISS

### A.     Choice of Law

The parties disagree on whether I should enforce the choice of law clause in the Offer Letter and apply New York law to O'Connell's claims.  Celonis argues that the choice of law clause is valid and New York law should apply because New York has a "substantial relationship to the parties and the subject matter of this action," and enforcement of the clause does not "run counter to any policy of California, which does not have a materially greater interest in the resolution of this action."  Motion to Dismiss ("MTD") [Dkt. No. 22] at 5.  O'Connell responds that California law governs this dispute because Section 925 of the California Labor Code invalidates the choice of law provision.  *See* Opposition to Motion to Dismiss ("MTD Oppo.") [Dkt. No. 28] at 6.  Even if Section 925 does not automatically invalidate the choice of law provision, O'Connell contends California law should still apply because enforcing the Offer Letter's choice of law provision contradicts "a fundamental policy" of California, which has an interest in protecting California-based employees.  *Id.*  I agree with O'Connell.

1       Section 925(a)(1) and (2) of the California Labor Code provide that employers are

2   prohibited from requiring California employees to agree to litigate disputes outside California or

3   to give up the protection of California laws.  *See DePuy*, 28 F.4th at 964; *Ruff*, 2022 WL 1500014,

4   at *6.  Under Section 925(b), any provision of a contract that violates subdivision (a) is "voidable

5   by the employee" under specific conditions.  *DePuy*, 28 F.4th at 964.  As explained above,

6   O'Connell satisfies every element under Section 925 and the forum selection clause in the Offer is

7   voidable.  *See supra* pp. 9-11.  The choice of law clause is similarly voidable by O'Connell

8   because it deprives him of "the substantive protection of California law with respect to a

9   controversy arising in California."  Cal. Lab. Code § 925(a)(2).  Under Section 925(b), the

10  provision is rendered void by O'Connell's request and California law governs the dispute.  *Id.*

11          **B.      Misrepresentation-Based Claims**

12          Celonis contends that Count I (intentional misrepresentation), Count II (false promises),

13  Count III (negligent misrepresentation), Count IV (declaratory judgment), Count V (breach of

14  contract), Count VI (promissory estoppel) and Count IX (violation of the UCL) must all be

15  dismissed because Celonis made no misrepresentation to O'Connell.  According to Celonis,

16  O'Connell's theory of misrepresentation – that underlies each of these claims – is contrary to the

17  express and clear terms of the Offer Letter.  According to Celonis, "under the plain terms of the

18  Signed Offer Letter, O'Connell was never promised the 60,000 RSUs that he now claims he is

19  owed.  Rather, Celonis offered a grant of 3,000 RSUs expressly conditioned on 'the completion of

20  the currently executed 1-for-10 forward stock split before the RSUs are granted.' (Compl. Ex. 1 ¶

21  4 n.1.)  Since that stock split did not occur, Celonis properly determined that O'Connell was

22  entitled to only 300 RSUs upon his hire, which became 6,000 RSUs after the 20-for-1 stock split."

23  MTD at 6.

24          However, as discussed below, the Offer Letter is neither as plain nor as clear as Celonis

25  contends.  O'Connell has generally alleged facts sufficient to state his claims.

26          **C.      Breach of Contract**

27                  **1.      Plain and Clear Terms**

28          Celonis argues that O'Connell's breach of contract claim is barred by the "plain and clear"

19

terms in his Officer Letter.  In that Letter, O'Connell was "granted 3,000[fn1] restricted stock units (RSUs)" with a note explaining that "[t]he number of RSUs specified assumes the completion of the currently executed 1-for-10 forward stock split before the RSUs are granted." Compl., Ex. 1 at 2.  Celonis contends that "under the plain terms of the [Offer]," the grant of 3,000 RSUs was "expressly conditioned" on the completion of the 1-for-10 forward stock split.  MTD at 6.  Because that stock split never occurred, as the Complaint admits, Celonis contends O'Connell "was never promised [] 60,000 RSUs" and was entitled to only 300 pre-split RSUs upon his hire. *Id.*  O'Connell's position is that the Offer Letter "unambiguously" granted him 3,000 RSUs, consistent with the representations of Celonis and recruiters during his pre-employment negotiations with Celonis.  Under his theory, the 3,000 RSUs was the initial grant and that the footnote referenced a possible 1-for-10 split that was either completed or would increase that value.

Read in full, the relevant language in the Offer Letter is ambiguous.  Celonis notes that the footnote language referencing the number of RSU and "assuming" the completion of a split supports its interpretation that the 1-for-10 forward stock split was merely "planned for" at the time O'Connell received the Offer Letter.  *See* MTD at 1; *see also* Compl. ¶ 36.  However, the footnote also described the split as "currently executed," implying either that the split had already occurred or, at a minimum, it was underway.  Compl., Ex. 1 at 2.

Under O'Connell's reasonable interpretation of the ambiguous text, O'Connell has adequately alleged both a breach of contract and a potential misrepresentation.  The reasonableness and plausibility of his claims are likewise supported by his allegation that while the Offer Letter provides "[t]he RSUs shall be subject to the terms and conditions set forth in the Celonis 2018 Restricted Stock Unit Plan and the standard form of Restricted Stock Unit Agreement thereunder," the 2018 Restricted Stock Unit Plan did not exist when O'Connell was hired.  Compl., Ex. 1 at 2; *see also* Compl. ¶ 4.

Second, Celonis's *post hoc* interpretation does not make the Offer Letter's terms "plain and clear."  MTD at 1.  Celonis argues that it is "self-evident" that O'Connell should be entitled to 6,000 RSUs because the grant of 3,000 RSUs was premised on the completion of a 1-for-10 stock

20

split, but it completed a 20-for-1 split in the end.  *Id.* at 6.  But nowhere in the Offer Letter did Celonis mention the potential change of stock split plan or the possible decrease in the number of RSUs granted.  O'Connell could not have reasonably expected this situation just from reading the terms of the Offer Letter.

O'Connell adequately alleges the breach of contract claim.  Under California contract law, "ambiguities in standard form contracts are to be construed against the drafter."  *Victoria v. Superior Court*, 40 Cal.3d 734, 739 (1985) (citations omitted).  Celonis relies on *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (1984), and *HGCD Retail Servs., LLC v. 44-45 Broadway Realty Co.*, 37 A.D.3d 43, 48-49 (N.Y. App. Div. 2006), arguing that I should find the language of the Offer Letter supports its interpretation, or otherwise I would be reading out the "assumption" language.  However, neither of those cases addresses a situation where a term of the contract is ambiguous and where the contract contains arguably contradictory language.  Celonis never offers an interpretation that plausibly accounts for both the "assumes" phrase as well as the "currently executed" language.  The language of the Offer Letter is ambiguous and at the motion to dismiss stage, O'Connell's interpretation is plausible.

### 2.    Condition Precedent

Celonis also argues that, at most, the grant of 3,000 RSUs was "expressly conditioned" upon the completion of the 1-for-10 forward stock split, and that since the stock split ultimately did not occur, O'Connell was not entitled to obtain the RSUs.  *Id.* at 7.  I disagree.  The purpose of the 10-for-1 stock split and how it impacts the purported grant of 3,000 RSUs is in dispute.

### 3.    Parol Evidence

Celonis argues that O'Connell cannot bolster his breach of contract claim with parol evidence because the parties have reduced their agreement to an integrated writing.  MTD at 8.  However, when the terms of a contract are ambiguous, extrinsic evidence is admissible to aid in the interpretation of the terms.  *See, e.g., WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710 (1996) ("Parol or extrinsic evidence is admissible to resolve an ambiguity.").

### D.    Intentional Misrepresentation and False Promise Claims

Celonis also moves to dismiss O'Connell's intentional misrepresentation and false promise

United States District Court
Northern District of California

claims (Counts I & II), arguing that under California law these fraud-based claims are duplicative

of and cannot be asserted at the same time as the breach of contract claim because they are

premised on Celonis's alleged duty to perform under the contract and O'Connell identifies no

damages separate from his breach claim.

However, at this juncture, O'Connell can proceed with his intentional and false promise

claims, at least in the alternative. O'Connell is not clearly attempting to allege a fraudulent breach

of contract or otherwise secure fraud damages for a breach claim, as in the cases Celonis relies on.

*See* MTD Reply at 5-6; *see e.g., Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988

(2004) (discussing the economic loss rule and its purpose to "prevent the law of contract and the

law of tort from dissolving one into the other").[2] Ultimately, whether O'Connell's contract-based

claim or tort-based claims may proceed and if so how – or if O'Connell is forced to elect one

remedy or the other – is better determined later in the case.

### E.       Misrepresentation Claim

Celonis moves to dismiss the negligent misrepresentation claim (Count III) because,

assuming California law applies, O'Connell fails to allege that Celonis made any specific

misrepresentation. O'Connell precisely alleges the bases for his misrepresentation claims.

Compl. ¶ 90 ("a. It was administering a legitimate, approved employee stock plan, referred to by

Celonis as the "Celonis 2018 Restricted Stock Unit Plan"; b. There was an underlying legitimate

and finalized stock agreement, the terms of which governed the "Celonis 2018 Restricted Stock

Unit Plan"; according to Celonis, this document was entitled "standard form of Restricted Stock

Unit Agreement" or "applicable RSU agreement"; c. The 1-for-10 forward stock split referenced

in the footnote of Mr. O'Connell's Offer Letter had already happened, or was close to being

---

[2] In its reply, Celonis cites to *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994) and *Robinson Helicopter*, to argue that O'Connell's fraud-based claims must be dismissed as duplicative of his breach of contract claim. *See* MTD Reply at 5. However, in those cases the courts only rejected the concept of tort damages for breach of contract violations. *See Applied Equip. Corp.*, 7 Cal. 4th at 515; *Robinson Helicopter*, 34 Cal. 4th at 990. At this stage, O'Connell may proceed with his overlapping theories. *See, e.g., Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996) ("An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. . . In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. . . Recovery, however, may be limited by the rule against double recovery of tort and contract compensatory damages.").

United States District Court
Northern District of California

1    completed, at the time he accepted Celonis' offer of employment; d. Celonis would grant Mr.

2    O'Connell 3,000 RSUs upon his acceptance of the Offer; e. Celonis, as a legitimate stock plan

3    administrator, would respond to reasonable requests for information and documents; and f. Mr.

4    O'Connell and other employees would earn significant income through Celonis' stock value

5    increases, if they continued their employment at the Company.").

6        O'Connell alleges that his reliance on these misrepresentations caused him harm.  The

7    extent of the harm and whether his reliance was reasonable can be tested on summary judgment.

8        **F.     Promissory Estoppel Claim Fails as No Justifiable Reliance as an At-Will**
         **Employee**

9        Celonis moves to dismiss O'Connell's promissory estoppel claim, contending that under

10   California law O'Connell cannot bring this claim given his status as an at-will employee.  That

11   might be the case if O'Connell was alleging that he was entitled to more stock based on a longer

12   tenure but for his wrongful termination.  *See, e.g.*, *Hughes v. Standard Chartered Bank, PLC*, No.

13   09 CIV. 4595 (PKC), 2010 WL 1644949, at *7 (S.D.N.Y. Apr. 14, 2010) ("The plaintiff's status as

14   an at-will employee renders any reliance on a representation of continuous employment

15   unreasonable").  As his opposition makes clear, O'Connell bases this claim on Celonis's alleged

16   grant of 3,000 RSUs upon his start date, not on an allegation that O'Connell's termination

17   prevented him from continued earning or vesting of stock.[3]

18       Similarly, while under California law "contract and promissory estoppel claims" are

19   "distinct or alternative theories of recovery but also as mutually exclusive," *Douglas E. Barnhart,*

20   *Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 243 (2012), Celonis cites no case law that

21   would preclude O'Connell from pursuing both theories at this early juncture.  *See also Allison v.*

22   *Clos-ette Too, LLC*, No. 14 CIV. 1618 LAK JCF, 2014 WL 4996358, at *8 (S.D.N.Y. Sept. 15,

23

24   ────────────────

25   [3] *UCAR Tech. (USA) Inc. v. Yan Li*, No. 5:17-CV-01704-EJD, 2017 WL 6405620, at *8 (N.D. Cal.
     Dec. 15, 2017), *on reconsideration*, No. 5:17-CV-01704-EJD, 2018 WL 2555429 (N.D. Cal. June
26   4, 2018), relied in by Celonis is not to the contrary.  There, there was no dispute that "employment
     agreements" the plaintiffs entered into gave "the board discretion to approve or disapprove the
27   grant of stock options and restricted stock," and therefore they could "not proceed on a promissory
     estoppel claim premised on a purported promise to issue stock options or restricted stock because
28   that subject matter is governed by the employment contracts" making those determinations
     discretionary.

United States District Court
Northern District of California

2014), *report and recommendation adopted sub nom. Ellison v. Clos-ette Too, LLC*, No. 14-CV-1618 LAK, 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014) (plaintiffs "who allege the existence of a valid contract may nonetheless plead the alternative theories of promissory estoppel and breach of contract when the defendant does not concede the enforceability of such contract").

The promissory estoppel claim survives at this juncture.

### G.      Not Entitled To Declaratory Relief

Celonis argues O'Connell's claim for declaratory relief should be dismissed because it is dependent on his breach of contact claim that, under Celonis's view, is barred by the plain and clear terms of the Offer Letter.  As noted above, the breach claim cannot be resolved at this juncture.  The same is true of the declaratory relief claim.

### H.      Retaliation and Wrongful Termination Claims

Celonis also moves to dismiss O'Connell's wrongful termination claims: Counts VII (Retaliation in Violation of FEHA, Cal. Gov. Code § 12940 *et seq*.); VIII (Retaliation in Violation of Cal. Lab. Code § 1102.5); IX (Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.); and X (Wrongful Termination in Violation of Public Policy).

#### 1.      Retaliation and Wrongful Termination Claims

Celonis argues that O'Connell has failed to adequately allege his retaliation claims under FEHA and Section 1102.5[4] because O'Connell fails to allege sufficient facts demonstrating a causal link between his protected activity and his termination.  Celonis argues, more specifically, that O'Connell must identify who the individuals who terminated him were and allegations that *those* individuals were aware of his protected activity.  MTD at 13.

I disagree.  O'Connell identifies with specificity the exact protected activity he engaged in that his supervisors or co-workers at Celonis had direct knowledge of, that his termination followed closely thereafter, and alleges that Celonis was motivated to terminate him due to that conduct.  Compl. ¶¶ 125, 126, 128, 133, 134.  That is sufficient at this juncture.

---

[4]  Cal. Lab. Code § 1102.5 prohibits an employer from retaliating against an employee who discloses or may disclose information related to, or who refuses to participate in, an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

United States District Court
Northern District of California

The cases Celonis relies on are readily distinguishable.  *See, e.g., Vizcaino v. Areas USA, Inc.*, 2015 WL 13573816, at *4 (C.D. Cal. Apr. 17, 2015) ("no facts alleged to support Plaintiff's conclusion that his termination was motivated by—or even related to—his gender"); *Airy v. City of Hesperia*, 2019 WL 8017811, at *3 (C.D. Cal. Sept. 13, 2019) (recognizing that "temporal proximity" along with knowledge of employer of the protected activity can satisfy the causation requirement for a retaliation claim, but dismissing claim where plaintiff was "vague" as to the timing of key events and based solely on the filing of an internal complaint in 2017 and a dismissal in 2019); *Estrada v. Gate Gourmet, Inc.*, 2017 WL 2468773, at *4 (C.D. Cal. June 6, 2017 (dismissing claim where "Plaintiff conclusorily alleges that his supervisor had an 'apparent dislike' for Plaintiff due to his gender. [] But the FAC lacks any facts to support such an allegation. Plaintiff points to sections of the FAC that allege certain actions were taken 'because of [Plaintiff's] gender,' but such conclusory allegations are inadequate under the operative pleading standard"). Here, O'Connell alleges more than sufficient facts describing the protected activity he engaged in of which Celonis was aware to support the causal connection.[5]

### 2.   UCL Claim

O'Connell alleges that Celonis violated the "unlawful" prong of California's Unfair Competition Law based on the statutory and common law violations alleged above and also by violating two additional statutory provisions: (1) California Government Code section 12964.5, prohibiting an employer to ask an employee to sign a release of claims in exchange for a raise or bonus, or as a condition of employment or continued employment; and (2) California Labor Code section 206.5(a), prohibiting an employer from requiring "a release of a claim or right on account of wages due, or to become due" unless payment of those wages has been made.

Celonis argues that section 12964.5 only prevents relinquishment of FEHA claims (or other discrimination or harassment-based claims) and here it did not seek a release of all claims, only claims related to the RSUs when offered to settle O'Connell's RSU claim. *See, e.g.*, Compl. ¶ 39 ("in order for Mr. O'Connell to participate in the tender offer, Celonis required him to

---

[5] Because his FEHA and Labor Code retaliation claims survive, and as this case is governed by California law, O'Connell's public policy wrongful termination claim (Count X) survives as well.

United States District Court
Northern District of California

'relinquish[] any claim you may have against the Company or its affiliates in relation to the Surrendered RSUs.' That is, Celonis attempted to force Mr. O'Connell to release claims against the Company in order to receive the benefit of the tender offer, which was offered to all other Celonis employees.").  It also asserts that section 206.5 cannot apply based on the facts alleged because the stock it offered in connection with the release was not "wages owed" but "a gratuitous offer to him to provide some liquidity on some quantity of" vested RSUs.  Finally, even if those contingent RSUs could be considered wages covered by this section, Celonis contends that because there is a "bona fide" dispute over how many RSUs were owed a violation of that section cannot be alleged.  *See, e.g., Watkins v. Wachovia Corp.*, 172 Cal. App. 4th 1576, 1587 (2009) ("When a bona fide dispute exists, the disputed amounts are not 'due,' and the bona fide dispute can be voluntarily settled with a release and a payment—even if the payment is for an amount less than the total wages claimed by the employee.").

Whether and how these two statutory provisions apply to O'Connell's situation – where both sides agree that O'Connell is entitled to at least *some* RSUs and O'Connell alleges he was denied the RSUs he was entitled to in part because of his protective activity – turns on disputed facts.  But even if one or both bases could not support a UCL/illegality claim, there are other bases for the UCL claim as discussed above.[6]  What can be alleged as a basis for an illegal prong claim under the UCL is better determined after discovery and on summary judgment.

## CONCLUSION

The motion to transfer venue is DENIED.  The motion to compel arbitration is DENIED. The motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: August 22, 2022

William H. Orrick
United States District Judge

---

[6] O'Connell has adequately alleged a violation of FEHA which itself could support an unlawful UCL prong claim.